UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

IRANIAN ALLIANCES ACROSS BORDERS,
UNIVERSITY OF MARYLAND COLLEGE
PARK CHAPTER
154 Grand Street
New York, NY 10013

DOE PLAINTIFFS 1–6[1]

                Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States
1600 Pennsylvania Avenue NW
Washington, DC 20500

ELAINE C. DUKE, in her official capacity as
Acting Secretary of Homeland Security
3801 Nebraska Avenue NW
Washington, DC 20016

KEVIN K. MCALEENAN, in his official
capacity as Acting Commissioner of U.S.
Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington, DC 20229

JAMES MCCAMENT, in his official capacity as
Acting Director of U.S. Citizenship and
Immigration Services
20 Massachusetts Avenue  NW
Washington, DC 20008

Case No. _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

---

[1] All of the individual Plaintiffs concurrently move to waive their obligations under Local Rule 102.2(a) to provide addresses, on the basis of their objectively reasonable fear that publicizing their home addresses would subject Plaintiffs to harassment (potentially including violence) and threats.  As set forth below, at least three of the "Doe" Plaintiffs reside in Montgomery County, Maryland.  For similar reasons, all Plaintiffs are concurrently moving to proceed anonymously.

REX W. TILLERSON, in his official capacity as
Secretary of State
2201 C Street NW
Washington, DC 20037

JEFFERSON BEAUREGARD SESSIONS III,
in his official capacity as Attorney General of the
United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

                          Defendants.

## INTRODUCTION

1.      Plaintiffs bring this case to challenge President Donald J. Trump's latest attempt
to implement an unlawful Muslim ban, this time through the "Presidential Proclamation
Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United
States by Terrorists or Other Public-Safety Threats" ("the Proclamation") issued on September
24, 2017 (**Attachment A** to this Complaint).  Plaintiffs are United States citizens and Lawful
Permanent Residents with bona fide relationships with current or potential applicants for
immigrant and non-immigrant visas to the United States from the countries affected by the
Proclamation, as well as an organization of similarly situated individuals.

2.      President Trump has been consistent and clear about his intention to restrict
Muslims from entering the United States.  Beginning on December 7, 2015, he called for "a total
and complete shutdown of Muslims entering the United States."  Throughout the remainder of
his campaign, he pledged to follow through on this promise in terms that explicitly discriminated
against Muslims.

3.      In the first days of his presidency, President Trump sought to fulfill this campaign promise by signing Executive Order 13769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "First Executive Order").  On its face, the First Executive Order restricted travel to the United States for 90 days for nationals of seven countries, all Muslim-majority countries.  It also put in effect a world-wide ban on refugees, with certain exceptions for those of minority religious faiths.  The First Executive Order spurred significant litigation in several district courts and was enjoined on a national basis on February 3, 2017, on a finding that the plaintiffs showed they were likely to succeed on the merits of their constitutional challenges, or, in the alternative, that "they have established at least serious questions going to the merits of their claims and the balance of equities tips sharply in their favor."  *Washington v. Trump*, No. 2:17-cv-00141-JLR, ECF 52 at 4 (W.D. Wash. Feb. 3, 2017).

4.      On March 6, 2017, President Trump rescinded and replaced the First Executive Order with Executive Order 13780 ("The Second Executive Order").  The Second Executive Order had the same purpose and effect as the first: Both were designed to, and did, prevent Muslims from entering the United States.  The major provisions of the two orders were nearly identical.  Both included language reflecting bigotry, implicitly associating Muslims with violence and terrorism.  The Second Executive Order suffered from the same fundamental constitutional and statutory defects as the first, so it too was blocked by the courts.  *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc).  The Supreme Court narrowed these two preliminary injunctions to enjoin the application of the relevant provisions with respect to visitors and immigrants to the United States only if they have a bona fide relationship with a U.S. individual or entity.  *Trump v. Int'l Refugee Assistance Project*, 137 S.Ct. 2080 (2017).

3

5.      In a continuation of his unlawful Muslim ban, on September 24, 2017, President Trump issued the Proclamation, which suspends categorically and indefinitely, without a specified expiration date, the entry into the United States of nationals of five of the six countries included in the Second Executive Order (Iran, Libya, Syria, Yemen, and Somalia), as well as yet another Muslim-majority country (Chad).  In an effort to disguise the Proclamation's targeting of Muslims, the Proclamation adds North Korea, even though virtually no North Korean nationals travel to the United States, and adds Venezuela, but then imposes only limited restrictions on the non-immigrant entry of just a small group of Venezuelan government officials and their immediate family members.

6.      Despite President Trump's attempts to cloak this latest iteration of his Muslim ban in religiously neutral garb by invoking a national security review and including North Korea and Venezuela, the purpose and effect of the Proclamation remain unchanged: to keep Muslims from entering the United States.

7.      The Proclamation penalizes the nationals of the targeted Muslim-majority countries without adequate determinations or findings as to a detrimental impact on the interests of the United States of any of those particular nationals, and it harms U.S. citizens and U.S. Lawful Permanent Residents with family or business ties to these countries—particularly those with bona fide relationships with current or potential applicants for immigrant- and non-immigrant visas to the United States from the countries affected by the Proclamation—as well as organizations of similarly situated individuals.

8.      The Proclamation, like the First and Second Executive Orders that preceded it, violates the Immigration and Nationality Act's prohibition against discrimination in the issuance of immigrant visas, 8 U.S.C. § 1152(a)(1), and exceeds the President's authority under the

4

Immigration and Nationality Act's provisions delineating classes of aliens ineligible for visas or admission and the nature of Presidential suspension that is authorized, 8 U.S.C. § 1182.

9.      The Proclamation, like the First and Second Executive Orders that preceded it, violates fundamental, dearly held constitutional protections.  It violates the guarantees that the government will not establish, favor, discriminate against, denigrate, or condemn any religion; the guarantee of freedom of speech; and the guarantee of equal protection of the law.  It betrays our nation's most central principles and forsakes our common heritage as a country founded in part on the principle of freedom from religious persecution.

10.      As a result of the Proclamation, the individual Plaintiffs are cut off from their family members, unable to have their relatives visit under tourist visas or join them as immigrants to the United States.  The Proclamation violates the Immigration and Nationality Act, constitutes an exercise of authority in excess of the Act, and violates the Establishment Clause and due process and equal protection guarantees of the Fifth Amendment.  Plaintiff Iranian Alliances Across Borders ("IAAB") suffers further harms to their constitutionally-protected right to engage in the free flow of ideas under the First Amendment.

**PARTIES**

A.      **The Plaintiffs**

11.      IAAB is a national organization, founded in 2003 by Iranian-American university students.  Its mission is to strengthen the Iranian diaspora community through leadership and educational programming that encourages collaboration and solidarity across borders and between communities.  IAAB organizes camps for youths, regional summits, Persian-language educational events, international conferences on the Iranian diaspora, and other activities, and in so doing is in the practice of inviting prominent scholars and other participants from outside the country, including from Iran, to the United States for its events.  IAAB affiliates through its

Campus Action Network with a national network of affiliated Iranian-American student groups and representatives, including groups at the University of Maryland College Park, one of the biggest and most active Iranian-American student groups in the nation, and a group at the University of Maryland in Baltimore.

12.     Doe Plaintiff #1 is a United States citizen of Iranian origin who fled religious persecution in Iran.  From 2015 to 2016, she lived in Bethesda, Maryland, and was looking forward to building her life there.  She met her now-husband in 2015, and they married in 2016.  Because her husband does not have permission to reside in the United States, she relocated to the United Arab Emirates on a temporary basis to live with him while his visa application to the United States was being processed.  She submitted an I-130 form for her husband in June 2016, and the request was approved on September 20, 2017.  She fears that due to the Proclamation, his visa will now be suspended and they will be indefinitely banned from building their life together in Maryland as they had hoped.  Their residency status in the United Arab Emirates is uncertain; they can never receive permanent residency and must continue to reapply for temporary residency every three years.  They would face persecution if forced to return to Iran.

13.     Doe Plaintiff #2 is a US citizen of Iranian origin.  She was born in the United States and has lived in Maryland ever since.  She graduated from the University of Maryland in College Park in 2017 and continues to live and work in Maryland.  In February 2017, she applied for a K-visa for her fiancé, who is Iranian.  He completed his interview at the U.S. Embassy in Ankara, Turkey on August 4, 2017, and she is awaiting a final response on his application.  If the visa is not granted by October 18, 2017, Doe Plaintiff #2 will be separated indefinitely from her fiancé, and will be forced to choose between the only home she has ever known and the love of her life.

14.     Doe Plaintiff #3 is a U.S. citizen of Iranian origin.  She became a US citizen in 1994.  She has lived in Montgomery County, Maryland for many years and has been a special-education teacher for Montgomery County Public Schools since 2006.  She has a pending I-130 application for her younger brother, who is the only remaining family member in Iran.  Her mother, father, and two brothers are all in the United States.  If the Proclamation goes into full effect on October 18, processing of her petition will be suspended and she will be indefinitely banned from reuniting here with her brother.

15.     Doe Plaintiff #4 is a US citizen of Iranian origin.  She has lived in the United States since 1978 and is a resident of Montgomery County, Maryland.  She has a pending I-130 application on behalf of her sister, who is 72 years old and remains in Iran.  If the Proclamation goes into full effect on October 18, the processing of her application will be suspended and she will be indefinitely banned from reuniting here with her sister.

16.     Doe Plaintiff #5 is an elderly Iranian national and a Lawful Permanent Resident of the United States, who resides in Montgomery County, Maryland.  She has been in the United States since 2010 and lives with her husband and her U.S. citizen son.  She applied to sponsor her second son shortly after she became a resident, and her I-130 application was approved in November 2010.  In December 2016, her son received a letter scheduling his interview at the U.S. Embassy in Ankara, Turkey for February 5, 2017.  Because of the First Executive Order, that interview was canceled.  After the First Executive Order was enjoined by the courts, his interview was rescheduled for March 20, 2017.  He completed the interview and is now awaiting final approval to come to the United States.  Doe Plaintiff #5 is in desperate need of her son's presence, as she is wheelchair-bound.  Her husband, who is 90 years old, also has significant health problems.  Her U.S. citizen son is their only caretaker, and they all need the assistance of

her other son.  If the Proclamation goes into full effect on October 18, the processing of his application will be suspended and Doe Plaintiff #5 will be indefinitely banned from reuniting with her son.

17.     Doe Plaintiff #6 is an Iranian national and a Lawful Permanent Resident of the United States, who resides in Maryland.  He has lived in the United States for five years and works as an engineer.  His wife, who also resides in Maryland, is Iranian and is employed at the National Institutes of Health as a biochemistry researcher.  She has a Ph.D. in Chemistry from Johns Hopkins University.  They have together made their home in Maryland.  His mother-in-law and sister-in-law have each applied for business/tourist (B1/B2) visitor visas in order to come visit them, and both had their interviews at the U.S. Embassy in Dubai on January 5, 2017. If their visitor visas are not issued before the Proclamation goes into full effect on October 18, they will be indefinitely banned from coming to the United States to visit their son-in-law and brother-in-law, as well as their daughter and sister, and they will be separated indefinitely from some of their closest and dearest family members.

**B.        The Defendants**

18.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.  President Trump issued the Proclamation that is the subject of this lawsuit.

19.     Defendant Elaine C. Duke is the Acting Secretary of Homeland Security and is sued in her official capacity.  The Department of Homeland Security ("DHS") is an executive department of the United States government, headquartered in Washington, DC.  DHS was involved in preparing a report that was cited in the Proclamation and is assigned several responsibilities regarding implementation and enforcement of the Proclamation.  Acting

Secretary Duke is responsible for DHS's administration of the Immigration and Nationality Act ("INA") and its implementation and enforcement of the Proclamation.

20.     Defendant Kevin McAleenan is the Acting Commissioner of U.S. Customs and Border Protection and is sued in his official capacity.  The U.S. Customs and Border Protection ("CBP") is an administrative agency within DHS, headquartered in Washington, DC.  The Proclamation assigns CBP various responsibilities regarding implementation and enforcement. Acting Commissioner McAleenan is responsible for CBP's implementation of the INA and its implementation and enforcement of the Proclamation.

21.     Defendant James McCament is the Acting Director of U.S. Citizenship and Immigration Services and is sued in his official capacity.  The U.S. Citizenship and Immigration Services ("USCIS") is an administrative agency within DHS, headquartered in Washington, DC. USCIS oversees lawful immigration to the United States.  Acting Director McCament is responsible for USCIS's implementation of the INA and its implementation and enforcement of the Proclamation.

22.     Defendant Rex W. Tillerson is the Secretary of State and is sued in his official capacity.  The Department of State is an executive department of the United States, headquartered in Washington DC.  The State Department consulted on the report prepared by DHS and is responsible for issuing visas and implementing the Proclamation.  The Proclamation assigns the State Department various responsibilities regarding implementation and enforcement. Secretary Tillerson oversees the State Department's activities with respect to the INA and its implementation and enforcement of the Proclamation.

23.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and is sued in his official capacity.  The Department of Justice ("DOJ") is an

executive department of the United States, headquartered in Washington, DC.  The Proclamation

assigns the Department of Justice various responsibilities regarding implementation and

enforcement.  Attorney General Sessions oversees the DOJ's activities with respect to the INA

and the implementation and enforcement of the Proclamation.

## JURISDICTION AND VENUE

24.     The Court has federal question jurisdiction under 28 U.S.C. § 1331.

25.     The Court has authority to award declaratory and injunctive relief under the

Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

26.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C).

## STATEMENT OF FACTS

**A.      President Trump's Express Intent to Target Muslims for Prohibition
        Against, or Restrictions on, Entry into the United States**

27.     President Donald Trump made his intent to impose a "Muslim ban" against those

entering the United States a central tenet of his campaign for President and since assuming

office, he has worked to give effect to this Muslim ban through various measures, culminating in

the Proclamation.

28.     In a series of interviews in the fall of 2015, Mr. Trump stated that he would

require Muslims in the United States to register with the government, and he insisted that the

country had "absolutely no choice" but to shut down mosques.

29.     On December 7, 2015, after the attack in San Bernardino, California, Mr. Trump

released a written statement on his campaign website calling for a "total and complete shutdown

on Muslims entering the United States until our country's representatives can figure out what is

going on."[2]  This original statement invoked invidious stereotypes of Muslims, suggesting that

all Muslims believe in "murder against non-believers who won't convert" and "unthinkable acts"

against women.  He suggested that barring immigration by Muslims was necessary to prevent

"horrendous attacks" on U.S. soil because "there is great hatred towards Americans by large

segments of the Muslim population."[3]

30.     When asked that same day how customs officials would apply such a ban,

Candidate Trump said, "[T]hey would say, are you Muslim?"  In response, a reporter asked, "[I]f

they say yes, they would not be allowed in the country?"  Candidate Trump responded, "That's

correct."[4]

31.     This intended Muslim ban became a central talking point of the Trump campaign,

promoted by Mr. Trump and his surrogates at campaign events across the country.

32.     On January 14, 2016, when asked whether he had rethought his "comments about

banning Muslims from entering the country," Mr. Trump responded "No."[5]

---

[2] Donald J. Trump, *Donald J. Trump Statement on Preventing Muslim Immigration*, DonaldJTrump.com (Dec. 7, 2015), https://web.archive.org/web/20170508151734/www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration.

[3] *Id.*

[4] Jenna Johnson & Sean Sullivan, *Donald Trump explains how his ban on Muslims entering the U.S. would work*, WASH. POST (Dec. 8, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/12/08/donald-trump-explains-how-his-ban-on-muslims-entering-the-u-s-would-work/?utm_term=.c0bda2a45d8b.

[5] Gerhard Peters & John T. Wooley, *Presidential Candidate Debates: Republican Candidates Debate in North Charleston, South Carolina*, The American Presidency Project (Jan. 14, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=111395.

33.     On March 9, 2016, Mr. Trump stated in a televised interview that "I think Islam hates us . . . and we can't allow people coming into this country who have this hatred of the United States."[6]

34.     On June 13, 2016, after an attack on a nightclub in Orlando, Florida, Mr. Trump gave a speech in which he said, "I called for a ban after San Bernardino, and was met with great scorn and anger, but now many are saying I was right to do so."  He went on to clarify that he blamed Islam, writ large, for such attacks:  "We cannot continue to allow thousands and thousands of people to pour into our country, many of whom have the same thought process as this savage killer."[7]  He blamed "Muslim communities" for failing to "turn in the people who they know are bad—and they do know where they are."[8]

35.     On July 17, 2016, Mr. Trump was asked to respond to criticism by his running mate (now the Vice President) that a ban on Muslims entering the country would be unconstitutional.  He responded, "So you call it territories, okay?  We're gonna do territories."[9]

36.     On July 24, 2016, Mr. Trump was asked if this statement constituted a "rollback" from his intended Muslim ban.  His answer was "I don't think so.  I actually don't think it's a rollback.  In fact, you could say it's an expansion.  I'm looking now at territories.  People were

---

[6] Exclusive Interview by Anderson Cooper with Donald Trump, Presidential Candidate, in Miami, Fl. (Mar. 9, 2016), http://www.cnn.com/TRANSCRIPTS/1603/09/acd.01.html.

[7] *Transcript: Donald Trump's national security speech*, Politico (Jun. 13, 2016, 3:06 PM), http://www.politico.com/story/2016/06/transcript-donald-trump-national-security-speech-224273.

[8] *Id.*

[9] Lesley Stahl, *The Republican Ticket: Trump and Pence*, CBS News (Jul. 17, 2016), http://www.cbsnews.com/news/60-minutes-trump-pence-republican-ticket/.

so upset when I used the word Muslim.  Oh, you can't use the word Muslim. . . . And I'm okay with that, because I'm talking territory instead of Muslim."[10]

37.     On October 9, 2016, during a televised presidential debate, Mr. Trump stated that "The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world."[11]

38.     These remarks signal Mr. Trump's search for a pretext to disguise blatant animus toward Muslims and presage how his administration would carry out his unconstitutional measure by dressing it up as a bona fide national security measure.

**B.     The First Executive Order**

39.     On January 27, 2017, a week after assuming office, President Trump signed Executive Order 13769, titled "Protecting the Nation from Foreign Terrorist Entry into the United States."[12]  At the time of signing, his original December 7, 2015, statement calling for a "total shutdown" of Muslim entrants remained live on his campaign website.

40.     At the signing ceremony, President Trump read the order's title, and stated, "We all know what that means."[13]  The next day, President Trump's advisor and vice chair of his transition team, Rudy Giuliani, stated that the First Executive Order was the result of an

---

[10] Interview by Chuck Todd with Donald Trump, Presidential Candidate on Meet the Press (Jul. 24, 2016, 11:47 AM), http://www.nbcnews.com/meet-the-press/meet-press-july-24-2016-n615706.

[11] Gerhard Peters & John T. Wooley, *Presidential Debate at Washington University in St. Louis, Missouri*, The American Presidency Project (Oct. 9, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=119038.

[12] 82 Fed. Reg. 8977 (Jan. 27, 2017).

[13] Matt Shuham, *Trump Signs Executive Order Laying Out 'Extreme Vetting,'* Talking Points Memo (Jan. 27, 2017, 4:56 PM), http://talkingpointsmemo.com/livewire/trump-signs-vetting-executive-order.

instruction by President Trump to him to find a way to implement a "Muslim ban" "legally."[14] Three days later, on January 30, President Trump referred on his Twitter account to the First Executive Order as "the ban."[15]

41.     The First Executive Order banned entry of nationals of seven Muslim-majority countries[16] for 90 days, suspended the entire U.S. Refugee Admissions Program for 120 days, established a policy of prioritizing certain religious denominations over others upon resuming the Refugee program, and indefinitely barred entry of all Syrian refugees.[17]

42.     In its "Purpose" section, the First Executive Order explicitly relied on negative stereotypes about Islam, stating that the United States should not admit individuals who "place violent ideologies over American law" or engage in acts of violence "including 'honor killings,' [or] other forms of violence against women."[18]

43.     An overt preference for Christian refugees was one of the objectives of the First Executive Order.  Section 5(b) directed the Secretary of State, in consultation with the Secretary of Homeland Security, to give priority to refugee claims made by persons fleeing "religious-

---

[14] *See* Rebecca Savransky, *Giuliani: Trump asked me how to do a Muslim ban 'legally,'* The Hill (Jan. 29, 2017, 8:48 AM), http://thehill.com/homenews/administration/316726-giuliani-trump-asked-me-how-to-do-a-muslim-ban-legally.

[15] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 30, 2017 5:31AM), https://twitter.com/realdonaldtrump/status/826060143825666051?lang=en ("If the ban were announced with a one week notice, the 'bad' would rush into our country during that week.  A lot of bad 'dudes' out there!").

[16] Some of the targeted countries have far more than  simple Muslim majority.  In Iran and Yemen for instance, over 99% of the population is Muslim.  *The World Factbook: Middle East: Iran*, CIA,  https://www.cia.gov/library/publications/the-world-factbook/geos/ir.html (last visited October 2, 2017); *The World Factbook: Middle East: Yemen*, CIA, https://www.cia.gov/library/publications/the-world-factbook/geos/ym.html (last visited October 2, 2017).

[17] *See* 82 Fed. Reg. 8977 §§ 3(c), 5(a)-(c).

[18] *Id.* § 1.

based persecution," but only if the claimant belonged to a "minority religion in the individual's country of nationality."[19]  Although this exception was not expressly limited to religious minorities residing in Muslim-majority countries, President Trump explained in an interview that this exception was intended to give priority to Christian refugees over their Muslim counterparts.[20]

44.     Like the current Proclamation, the First Executive Order attempted to mask its unconstitutional purposes with national security and foreign policy rationales, suggesting that its implementation would protect the country from terrorists.

45.     The First Executive Order was immediately met with a series of legal challenges across the country.  The day after the First Executive Order was issued, the U.S. District Court for the Eastern District of New York granted an Emergency Motion for Stay of Removal, enjoining the government from removing individuals with approved applications under the Refugee Admissions Program, holders of visas, and other individuals legally authorized to enter the United States from the seven countries designated in the First Executive Order.  *Darweesh v. Trump*, No. 1:17-cv-00480, ECF 8 at 2 (E.D.N.Y. Jan. 28, 2017).  It did so on the basis that the petitioners had a strong likelihood of success in establishing that removal would violate their rights to due process and equal protection, and that there was imminent danger of "substantial and irreparable injury to refugees, visa-holders, and other individuals from nations subject to" the First Executive Order.  *Id.*

---

[19] *Id.* § 5(e).

[20] David Brody, *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees*, CBN News (Jan. 27, 2017), http://www1.cbn.com/thebrodyfile/archive/2017/01/27/brody-file-exclusive-president-trump-says-persecuted-christians-will-be-given-priority-as-refugees.

46.     On February 3, 2017, the U.S. District Court for the Western District of
Washington issued a Temporary Restraining Order enjoining enforcement of several sections of
the First Executive Order on a nationwide basis. *Washington v. Trump*, No. 2:17-cv-00141-JLR,
ECF 52 at 5 (W.D. Wash. Feb. 3, 2017).  That order was upheld by the U.S. Court of Appeals for
the Ninth Circuit. *Washington v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017).

47.     During the pendency of the Washington case, the U.S. District Court for the
Eastern District of Virginia preliminarily enjoined Section 3(c) of the First Executive Order,
finding that the statements made by President Trump and his Administration demonstrated an
intent to ban Muslims from the United States, and that the plaintiffs were therefore likely to
succeed on the merits of their Establishment Clause claims. *See Aziz v. Trump*, No. 1:17-cv-
00116-LMB-TCB, ECF 111 at 7–9, 20 (E.D. Va. Feb. 13, 2017).

48.     One week after the Ninth Circuit's decision in *Washington v. Trump*, the
Department of Justice informed the Ninth Circuit that the President intended to rescind the First
Executive Order and replace it with a "new, substantially revised Executive Order to eliminate
what the panel erroneously thought were constitutional concerns."  Defendants-Appellants'
Supplemental Brief on *En Banc* Consideration, *Washington v. Trump*, No. 17-35105, ECF 154 at
4 (9th Cir. Feb. 16, 2017).

49.     On February 21, 2017, a White House Senior Policy Advisor elaborated during an
interview that the intended revised executive order would include "mostly minor technical
differences" but "[f]undamentally, you're still going to have the same basic policy outcome for
the country."[21]

---

[21] Matt Zapotosky, *A new travel ban with 'mostly minor technical differences'? That probably
won't cut it, analysts say*, Wash. Post (Feb. 22, 2017),
https://www.washingtonpost.com/world/national-security/a-new-travel-ban-with-mostly-

50.     On February 24, 2017, the Associated Press obtained a DHS report prepared at the request of the Acting Under Secretary for Intelligence and Analysis.[22]  That report found that citizenship is "likely an unreliable indicator" of terrorist activity,[23] despite the First Executive Order's supposed purpose to protect the nation from foreign terrorists.

### C.     The Second Executive Order

51.     On March 6, 2017, President Trump issued a new executive order with the same name.[24]  The Second Executive Order removed Iraq from the list of countries from which nationals were categorically banned from entry into the United States, but subjected Iraqis entering the United States to enhanced vetting.[25]  The Second Executive Order also eliminated the priority for refugees of minority religions but still referenced "acts of gender-based violence against women, including so-called 'honor killings' in the United States by foreign nationals."[26]

52.     The Second Executive Order also directed the Secretary of Homeland Security to "conduct a worldwide review" to determine what information the U.S. government needed from foreign governments to adjudicate visa applications.[27]

53.     On March 15, 2017, the U.S. District Court for the District of Hawaii issued a nationwide temporary restraining order against Sections 2 and 6 of the Second Executive Order.

---

minortechnical-differences-that-probably-wont-cut-it-analysts-say/2017/02/22/8ae9d7e6-f918-11e6-bf01-d47f8cf9b643_story.html.

[22] Rick Jervis, *DHS memo contradicts threats cited by Trump's travel ban*, USA Today (Feb. 24, 2017), http://www.usatoday.com/story/news/2017/02/24/dhs-memo-contradicttravel-ban-trump/98374184/.

[23] *Id.*

[24] 82 Fed. Reg. 13209 (March 6, 2017).

[25] *Id.* § 4.

[26] *Id.* § 11(a)(iii).

[27] *Id.* § 2(a).

*Hawaii v. Trump*, 241 F. Supp. 3d 1119, 1140 (D. Haw. 2017).[28]  It did so on the basis that the plaintiffs "met their burden of establishing a strong likelihood of success on the merits of their Establishment Clause claim."  *Id.* at 1123.

54.     The next day, this Court issued a preliminary injunction against enforcement of Section 2(c) of the Second Executive Order (the provision restricting entry into the United States by nationals of Iran, Syria, Yemen, Sudan, Libya, and Somalia).  *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539, 565–66 (D. Md. 2017).  The Court ruled that the plaintiffs showed a likelihood of success on the merits of their Establishment Clause challenge. *Id.* at 564.

55.     Speaking at a rally in Nashville, Tennessee, on the same day that the Hawaii Court issued its ruling, President Trump stated that the Second Executive Order was a "watered-down version" of the first one and that "we ought to go back to the first one and go all the way."[29]

56.     On May 25, 2017, the U.S. Court of Appeals for the Fourth Circuit upheld in large part the nationwide injunction issued by this Court.  *IRAP*, 857 F.3d at 606.  The government filed a petition for writ of certiorari in the U.S. Supreme Court on June 1, 2017.  On the same day, the government filed with the Supreme Court an application for a stay of the injunctions in both *IRAP v. Trump* and *Hawaii v. Trump* (the latter of which was still pending on appeal in the Ninth Circuit).

---

[28] The Ninth Circuit lifted the injunction with respect to the review and reporting provisions of the Second Executive Order on June 12, 2017.  *Hawaii*, 859 F.3d at 786.

[29] Matt Zapotosky, et al., *Federal judge in Hawaii freezes President Trump's new entry ban*, Wash. Post (Mar. 16, 2017), https://www.washingtonpost.com/local/social-issues/lawyers-face-off-on-trump-travel-ban-in-md-court-wednesday-morning/2017/03/14/b2d24636-090c-11e7-93dc-00f9bdd74ed1_story.html?utm_term=.bf85c7c44a4c.

57.     On June 12, 2017, the Ninth Circuit ruled on the *Hawaii* injunction, unanimously ruling in favor of the plaintiffs and upholding the injunction in large part.  859 F.3d at 741. Rather than relying on the constitutional grounds cited by the district court, the Ninth Circuit held that portions of the Second Executive Order likely exceeded the President's authority under the INA.  *Id.*

58.     The provisions of the Second Executive Order were originally scheduled to end on June 14, 2017, raising questions about whether the appeal to the Supreme Court might be moot.  That day, however, the White House issued a Presidential Memorandum delaying the start date of each of the provisions that had been enjoined by the courts until 72 hours after the injunctions were lifted or stayed as to those provisions.

59.     On June 26, 2017, the Supreme Court granted the petitions for certiorari.  It consolidated the cases and set them for argument during the first argument session of the Court's next Term, in October 2017, and ordered the parties to address in their briefing the additional question whether the challenges became moot on June 14.  137 S.Ct.at 2087.  The Court also stayed the preliminary injunctions "to the extent the injunctions prevent enforcement of § 2(c) with respect to foreign nationals who lack any bona fide relationship with a person or entity in the United States."  *Id.*  The portions of the injunctions not subject to the stay remain in effect, and the Second Executive Order therefore cannot be enforced against foreign nationals who do have such a "bona fide relationship."[30]   The Ninth Circuit reviewed the District of Hawaii's modified injunction, and in so doing ruled that the district court did not err in including

_____

[30] The Supreme Court's order outlined the requirements for a bona fide relationship:  "For individuals, a close familial relationship is required."  For entities, "the relationship must be formal, documented, and formed in the ordinary course, rather than for the purpose of evading EO-2."  137 S.Ct. at 2088.

grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States within the definition of bona fide close familial relationships. *Hawaii v. Trump*, __ F.3d __, 2017 WL 3911055 at *9 (9th Cir. September 7, 2017).

60.     During the litigation prompted by the Second Executive Order, President Trump continued to make official statements underscoring that the Executive Orders, in each iteration, were intended to restrict Muslims from entering the United States.  In response to a terrorist attack in London on September 15, 2017, for example, President Trump tweeted that "[t]he travel ban into the United States should be far larger, tougher and more specific—but stupidly, that would not be politically correct!"[31]

### D.     The Proclamation

61.      On September 24, 2017, President Trump issued the Proclamation, which now expands the Muslim ban to a ban of indefinite duration against the entry into the United States of nationals of the listed Muslim-majority countries, including individuals with bona fide relationships with American citizens and Lawful Permanent Residents.[32]  Unlike the two Executive Orders, there is no time limit in the Proclamation; affected persons are indefinitely banned from entering the United States.

---

[31] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 15, 2017, 3:54 AM), https://twitter.com/realdonaldtrump/status/908645126146265090?lang=en.

[32] *Presidential Proclamation Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*, The White House: Office of the Press Secretary (Sept. 24, 2017), **Attach. A;** https://www.whitehouse.gov/the-press-office/2017/09/24/enhancing-vetting-capabilities-and-processes-detecting-attempted-entry.

62.     The Proclamation expressly refers to the Second Executive Order, does not rescind or nullify the vast majority of the provisions of the Second Executive Order, and imposes the indefinite ban against entry into the United States as immigrants on nationals of the following six Muslim-majority countries, and broad bans on certain visas, with limited exceptions,[33] as follows:

a.   Chad:  All nationals of Chad are banned from entry into the United States as immigrants or under business (B-1), tourist (B-2), or business/tourist (B-1/B-2) visas.[34]

b.   Iran:  All nationals of Iran are banned from entry into the United States, except under student and exchange visitor visas (F, M, and J), and such student and exchange visitor visa applicants are subject to unspecified "enhanced screening and vetting requirements."[35]

c.   Libya: All nationals of Libya are banned from entry into the United States as immigrants or under business (B-1), tourist (B-2), or business/tourist (B-1/B-2) visas.[36]

---

[33] The visa bans outlined in Section 2 of the Proclamation do not apply to lawful permanent residents of the United States; foreign nationals admitted to the United States on or after the applicable effective date of the Proclamation; "any foreign national who has a document other than a visa—such as a transportation letter, an appropriate boarding foil, or an advance parole document—valid on the applicable effective date under section 7 of this proclamation or issued on any date thereafter"; dual nationals; foreign nationals traveling on a diplomatic or diplomatic-type visa, NATO visa, C-2 visa, or G-1, G-2, G-3 or G-4 visa; foreign nationals who have been granted asylum; refugees who have already been admitted; or individuals who have been granted relief under the Convention Against Torture.  *Id.* § 3(b).

[34] *Id.* § 2(a)(ii).

[35] *Id.* § 2(b)(ii).

[36] *Id.* § 2(c)(ii).

    d.   Syria: All nationals of Syria are banned from entry into the United States.[37]

    e.   Yemen: All nationals of Yemen are banned from entry into the United States as immigrants or under business (B-1), tourist (B-2), or business/tourist (B-1/B-2) visas.[38]

    f.   Somalia: All nationals of Somalia are banned from entry into the United States as immigrants.  Somali nationals traveling on non-immigrant visas are subject to unspecified "additional scrutiny."[39]

63.    The Proclamation's restrictions that apply to individuals who were subject to the operative provisions of the Second Executive Order—nationals from Iran, Libya, Somalia, Yemen, and Syria who do not have a credible claim of a bona fide relationship with a person or entity in the United States—went into effect on September 24, 2017.  All of the Proclamation's other restrictions are set to go into effect on October 18, 2017.

64.    The bans on entry into the United States by nationals of these Muslim-majority countries mean that U.S. citizens and Lawful Permanent Residents cannot reunite in the United States with their spouses, children, and parents who are nationals of countries subject to the Proclamation.  And the Proclamation purports to justify its blanket restrictions on immigrant entry from all of these Muslim-majority countries by observing that Lawful Permanent Residents receive "more enduring rights" and are therefore "more difficult to remove than nonimmigrants."[40]

---

[37] *Id.* § 2(e)(ii).

[38] *Id.* § 2(g)(ii).

[39] *Id.* § 2(h)(ii).

[40] *Id.* § 1(h)(ii).

22

65.    In an effort to disguise the underlying intent to ban entry of Muslims into the United States, the Proclamation—unlike its predecessor Executive Orders—also imposes nominal restrictions relating to nationals of two non-Muslim-majority countries: North Korea and Venezuela.  The Proclamation bans immigrant and non-immigrant visas for North Korean nationals (except for the limited exceptions in § 3(b)), but the number of visas issued each year to North Korean nationals is extraordinarily low.[41]  And unlike the restrictions imposed for the Muslim-majority countries, most nationals of Venezuela generally are not subject to a ban; the Proclamation applies solely to a small group of officials of the Venezuelan government and their immediate family traveling under certain classes of non-immigrant visas.[42]  The additional travel restrictions involving these two non-Muslim-majority countries are thus without practical effect, and in any event cannot transform the unconstitutional Muslim ban into a permissible national-security measure.

66.    Excluding the makeweight additions of North Korea and Venezuela, which are subject to only negligible impacts, the Proclamation restricts entry of more than 157 million nationals of Chad, Iran, Libya, Somalia, Syria, and Yemen.  Of those nationals, a conservative estimate is that at least 137 million of those people—over 87%—are Muslim.[43]

---

[41] For example, according to the 2015 Yearbook of Immigration Statistics published by DHS, only 99 non-immigrants from North Korea were admitted to the United States in 2015.  *Table 26: Nonimmigrant Admissions (I-94 Only) By Region And Country Of Citizenship: Fiscal Years 2013 To 2015*, Homeland Security,  https://www.dhs.gov/immigration-statistics/yearbook/2015/table26 (last published Dec. 15, 2016).  Similarly, only 55 people from North Korea obtained Lawful Permanent Resident status in 2015.  *See Table 3. Persons Obtaining Lawful Permanent Resident Status By Region And Country Of Birth: Fiscal Years 2013 To 2015*, Homeland Security, https://www.dhs.gov/immigration-statistics/yearbook/2015/table3 (last published Dec. 15, 2016).

[42] Attach. A § 2(f)(ii).

[43] *The World Factbook, Country Comparison: Population*, CIA https://www.cia.gov/library/publications/the-world-factbook/rankorder/2119rank.html (last

67.     Also to try to disguise its underlying religious purpose, the Proclamation purports to be based on the worldwide review of information-sharing practices, policies, and capabilities of foreign countries directed by the Second Executive Order.  The Proclamation states that the Secretary of Homeland Security, with assistance from the Secretary of State and Director of National Intelligence, "developed a baseline for the kinds of information required from foreign governments" regarding individuals seeking entry into the United States,[44] and evaluated each country against this baseline.[45]

68.     The contents of the Department of Homeland Security's review and evaluation have not been made public, despite discussion in the Proclamation indicating that portions have been shared with foreign governments during a "50-day engagement period" with other countries with respect to the baseline,[46] and indicating that the review and evaluation contain information similar to that set forth publicly in the First and Second Executive Orders.

69.     The government of Chad issued a statement on September 25, 2017, expressing "astonishment" and "incomprehension in the face of the official reasons for [the] decision" to extend the ban against entry to the United States to nationals of Chad.[47]

---

visited Oct. 1, 2017.  The Factbook lists the populations of the six Muslim-majority countries subject to the Proclamation, in the total amount of more than 157 million people, as well as the estimated percentages of Muslims in each country.  This calculation excludes the entire Muslim population of Somalia, for which information was not available; this suggests that the true proportion of the nationals subject to the ban who are Muslim is actually considerably higher than 87%.

[44] Attach. A § 1(c).

[45] *Id.* §§ 1(d), (e).

[46] *Id.* § 1(f).

[47] Helene Cooper, Michael D. Shear, & Dionne Searcey, *Chad's Inclusion in Travel Ban Could Jeopardize American Interests, Officials Say*, N.Y. Times (Sept. 26, 2017), https://www.nytimes.com/2017/09/26/world/africa/chad-travel-ban-american-interests.html.

70.     The Proclamation states that the Secretary of Homeland Security "assesse[d]" seven countries to "have 'inadequate' identity-management protocols, information-sharing practices, and risk factors with respect to the baseline . . . such that entry restrictions and limitations are recommended: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen."[48] The Secretary submitted a report on September 15, 2017, to the President "recommending entry restrictions and limitations" on nationals of the seven countries, but the specifics of those recommendations are not provided in the Proclamation.  He also "assesse[d]" that Iraq "did not meet the baseline" but declared that "additional scrutiny" was recommended nonetheless. Although Somalia was not similarly "assessed" by the Secretary, he determined that "special circumstances" warrant "entry restrictions, limitations, and other measures" for nationals of Somalia.[49]  The Proclamation states that the President reviewed the report and imposed the "restrictions and limitations" by the proclamation because, in his judgment, they were necessary, among other reasons, "to elicit improved identity-management and information-sharing protocols and practices from foreign governments."[50]

71.     The Proclamation applies to nationals of the listed countries regardless of where they currently reside, including those who reside in other countries that have not been identified as having "'inadequate' identity-management protocols, information-sharing practices, and risk factors"—and even if those persons have resided outside their country of origin for their entire lives, and even if those persons reside outside their country of origin because of fear of persecution.  This categorical ban on the entry into the United States of more than 157 million

---

[48] Attach. A § 1(g).

[49] *Id.* § 1(i).

[50] *Id.* § 1(h)(i).

nationals of six Muslim-majority nations cannot be justified by a single report prepared in a matter of months  on worldwide practices, and cannot be reconciled with the framework of the INA.

72.     The Proclamation's purported reliance on various criteria and imposition of restrictions on North Korean nationals and on a small group of Venezuelan government officials paper over the legal and constitutional defects of the predecessor expressions of the Muslim ban with post-hoc national security justifications.  The national-security and other purported rationales for the bans imposed by the Proclamation on millions of Muslims from the several Muslim-majority countries, which disproportionately harm their American Muslim relatives, are not bona fide reasons for the Proclamation.

73.     The recently generated national security rationale cannot wipe away the anti-Muslim bias that has animated President Trump's dogged efforts to fulfill his promise to ban Muslims from entering this country.  Indeed, the history of the President's failed attempts to enact his intended Muslim ban through two Executive Orders supports the inference that the national security report is a pretext.  And even if the national security report identifies legitimate vetting and information-sharing issues with respect to the specified countries, the categorical and undifferentiated ban of at least 137 million Muslims is a wildly overbroad response that violates both the INA and the Constitution.

## CAUSES OF ACTION

### COUNT I
### (Violation of the Immigration and Nationality Act)
### (All Parties Against All Defendants)

74.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

75.     The Immigration and Nationality Act ("INA") provides that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."  8 U.S.C. § 1152(a)(1)(A).

76.     The Proclamation violates the INA by discriminating on the basis of nationality.

77.     Defendants' violation causes ongoing harm to Plaintiffs.

## COUNT II
**(Exceeding the Executive's Authority Under the Immigration and Nationality Act)**
**(All Parties Against All Defendants)**

78.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

79.     Congress established a detailed framework in the INA, 8 U.S.C. § 1182, of specific criteria for "classes of aliens ineligible for visas or admission," 8 U.S.C. § 1182(a), including on "security and related grounds," 8 U.S.C. § 1182(a)(3), specifically terrorism, 8 U.S.C. § 1182(a)(3)(B), 1182(a)(3)(F), and foreign policy, 8 U.S.C. § 1182(a)(3)(C).  Section 1182 provides for suspension of entry or imposition of restrictions on aliens by the President "for such period" as deemed necessary if he "finds" that entry of the aliens or class of aliens "would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  The INA further addresses aspects of immigration and other entry into the United States in various provisions throughout the statute.

80.     The Proclamation exceeds the Executive's authority under the INA, including under 8 U.S.C. §§ 1182(f).

81.     Defendants' violation causes ongoing harm to Plaintiffs.

**COUNT III**
**(Violation of the Establishment Clause of the First Amendment)**
**(All Plaintiffs Against All Defendants)**

82.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

83.     The Establishment Clause of the First Amendment to the U.S. Constitution prohibits the government from "differentiat[ing] among religions." *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989) (citing *Larson v. Valente*, 456 U.S. 228 (1982)).

84.     The Establishment Clause further prohibits the government from taking actions that lack a secular purpose or have the principal or primary effect of advancing or inhibiting religion.

85.     The Establishment Clause prohibits the government from endorsing or disapproving of a religion or particular religious beliefs.

86.     The Proclamation impermissibly discriminates on the basis of religion and constitutes an unconstitutional denominational preference against Muslims.  Despite being cloaked in the rhetoric of national security, the Proclamation—like the Executive Orders that preceded it—is intended to and does disproportionately harm Muslims because of their faith. The six countries whose nationals the Proclamation meaningfully restricts—Chad, Iran, Libya, Syria, Yemen, and Somalia—are all Muslim-majority countries.  The other two countries nominally covered by the ban are North Korea, whose nationals currently receive a vanishingly small number of visas, and Venezuela, whose nationals are affected only if they are family members of government officials "involved in screening and vetting procedures" who are not seeking to immigrate to the United States.  Thus the Proclamation's effects on non-Muslim countries' nationals are *de minimis*.  The continued outsized effect on Muslim entrants demonstrates that the Proclamation discriminates on the basis of religion.

28

87.     In addition, the Proclamation violates the Establishment Clause because the President's repeatedly stated intent to ban Muslims from immigrating to or entering the United States and the Proclamation's direct lineage from and effectuation of those policy statements, demonstrate that the Proclamation lacks a predominantly secular purpose and that it has a principal effect of discriminating against, denigrating, and disfavoring Muslims.

88.     Finally, the Proclamation communicates official disapproval of Islam, stigmatizing Plaintiffs and their religion.

89.     Defendants' violation causes ongoing harm to Plaintiffs.

**COUNT IV**
**(Violation of the Free Speech Clause of the First Amendment)**
**(Iranian Alliances Across Borders Against All Defendants)**

90.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     The Free Speech Clause of the First Amendment protects the "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

92.     The Proclamation violates the right of IAAB to receive information and ideas from the Persian scholars (many of whom are nationals of Iran) whom IAAB routinely invites to speaking engagements and other cultural community-building events.

93.     Defendants' violation causes ongoing harm to IAAB.

**COUNT V**
**(Violation of Equal Protection Under the Fifth Amendment)**
**(All Plaintiffs Against All Defendants)**

94.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

95.     Plaintiffs are entitled to the protections of the Fifth Amendment.

96.     The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the law.

97.     The Proclamation was motivated by animus and a desire to harm a particular group.

98.     The Proclamation has a disparate impact, targeting individuals for discriminatory treatment on the basis of religion and national origin.  The discriminatory terms and application of the Proclamation are not justified by legitimate governmental interests, much less by compelling ones.

99.     Defendants have violated the equal protection guarantee of the Fifth Amendment.

100.    Defendants' violation causes ongoing harm to Plaintiffs.

**COUNT VI**
**(Violation of Procedural Due Process under the Fifth Amendment)**
**(All Plaintiffs Against All Defendants)**

101.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

102.    The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests without due process of law.

103.    Congress has granted statutory rights and prescribed procedures applicable to prospective immigrants and refugees.  Due process rights attach to those statutory rights.

104.    In addition, United States citizens have a cognizable liberty interest with respect to the ability of specific noncitizen family members to travel to the United States.

105.    The Proclamation, in depriving immigrants and refugees of the rights afforded to them by statute, and in depriving United States citizens of travel by specific noncitizen family members to the United States, violates the procedural due process guarantees of the Fifth Amendment.

106.    Defendants' violation causes ongoing harm to Plaintiffs.

### PRAYER FOR RELIEF

WHEREFORE, all Plaintiffs seek an order and judgment to:

107.    Declare that the Proclamation, on its face or as applied, violates the Immigration and Nationality Act, exceeds the Executive's authority under the Act, and violates the Constitution and laws of the United States;

108.    Enter a nationwide injunction enjoining Defendants from:

   a.   Enforcing the Proclamation;

   b.   Applying the Proclamation to deny, revoke, restrict, cancel, or delay issuance of any immigrant or nonimmigrant visa;

   c.   Applying the Proclamation to deny or suspend entry or admission of any person;

   d.   Applying the Proclamation to prohibit any person from applying for or receiving any benefit under the Immigration and Nationality Act;

   e.   Denying any person subject to the Proclamation access to legal counsel of his or her choice;

   f.   Applying the Proclamation to instruct any airline or other common carrier to deny passage to any person;

   g.   Applying the Proclamation to impose any penalty on any airline or other common carrier for allowing passage to any person covered by the Proclamation;

109.    Order Defendants promptly to provide written guidance to employees, contractors, and agents of DHS, the State Department, U.S. Customs and Border Protection, and all other United States government officials and entities necessary to ensure full and timely compliance with all terms of the order to be entered by the Court;

110.     Require Defendants promptly to rescind any guidance, directive, memorandum, or statement interpreting or applying the Proclamation that conflicts with any term of the order to be entered by the Court;

111.     Require Defendants promptly to post a copy of the written guidance required under paragraph 114 on government websites, including state.gov;

112.     Require Defendants promptly to update all relevant public guidance, documentation, and FAQs to reflect the terms of the order to be entered by the Court;

113.     Require Defendants to instruct the consular officials handling the visa applications of Plaintiffs, their families, and IAAB's invitees and others attending IAAB programs to print and issue the visas and travel documents within 10 days of the Court's order;

114.     Require Defendants to instruct the relevant officials from the State Department and Department of Homeland Security not to deny visas or entry into the United States to Plaintiffs, their families, or IAAB's invitees and others attending IAAB programs for any reason directed by or arising from the Proclamation or guidance implementing it;

115.     Require Defendants to process without undue delay visa applications submitted by nationals of Chad, Iran, Libya, Syria, Yemen, and Somalia;

116.     Require Defendants to file with the Court, on the tenth day of each month following the entry of the Court's order, a signed and verified declaration stating:

   a.   The number of United States visas granted during the previous month to nationals of Chad, Iran, Libya, Syria, Yemen, and Somalia;

   b.   The number of United States visa applications denied during the previous month to nationals of Chad, Iran, Libya, Syria, Yemen, and Somalia;

32

     c.    For each denied visa application under the above subparagraph (b), the identifying information or numbers for the application for the Court's reference;

     d.    For each denied visa application under the above subparagraph (b), a detailed explanation of the reason or reasons why the application was denied.  The explanation under this subsection must state the facts, authorities, and reasoning relevant to the Defendants' decision on the application;

117.    Require Defendants to pay reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

118.    Any other relief that the Court deems necessary or just to cure the violations specified in this Complaint or that justice may require.

Dated: October 2, 2017

Respectfully submitted,

*Marianne F. Kies*

Johnathan Smith*
Sirine Shebaya (Bar # 07191)
MUSLIM ADVOCATES
P.O. Box 66408
Washington, D.C. 20035
Tel: (202) 897-2622
Fax: (415) 765-1774
johnathan@muslimadvocates.org
sirine@muslimadvocates.org

Richard B. Katskee (Bar # 27636)
Eric Rothschild*
Andrew Nellis*^
AMERICANS UNITED FOR SEPARATION
OF CHURCH AND STATE
1310 L St. NW, Ste. 200
Washington, D.C. 2005
Tel: (202) 466-3234
Fax: (202) 466-3353
katskee@au.org
rothschild@au.org

Mark H. Lynch (Bar # 12560)
Mark W. Mosier*
Herbert L. Fenster*
José E. Arvelo*
John W. Sorrenti*
Marianne F. Kies (Bar # 18606)
COVINGTON & BURLING LLP
One City Center
850 10th Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
Fax: (202) 662-6302
mlynch@cov.com
mmosier@cov.com
hfenster@cov.com
jarvelo@cov.com
jsorrenti@cov.com
mkies@cov.com

Rebecca G. Van Tassell*
COVINGTON & BURLING LLP

nellis@au.org                        1999 Avenue of the Stars
                                     Los Angeles, California 90067
                                     Tel: (424) 332 4800
                                     Fax: (424) 332-4749
                                     RVanTassell@cov.com

                                     *Attorneys for Plaintiffs*

\* *pro hac vice* application forthcoming
^ Admitted only in New York; supervised by Richard B. Katskee, a member of the D.C. Bar.