**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No. 8:17-cv-00361-TDC |
| DONALD TRUMP, in his official capacity as President of the United States, *et al.*, | ) ) ) ) |
| Defendants. | ) ) |
| IRANIAN ALLIANCES ACROSS BORDERS, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No. 8:17-cv-02921-TDC |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) ) ) ) ) |
| Defendants. | ) ) |
| EBLAL ZAKZOK, *et al.*, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No. 1:17-cv-02969-TDC |
| DONALD TRUMP, in his official capacity as President of the United States, *et al.*, | ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTIONS

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 4

I.      Legal Framework ............................................................................................... 4

II.     Executive Order No. 13,780 ............................................................................... 4

III.    The President's Proclamation ............................................................................. 5

        A.      DHS's Worldwide Review and Recommendations ................................. 6

        B.      The President's Findings and Suspensions of Entry .............................. 7

STANDARD OF REVIEW ............................................................................................. 9

ARGUMENT ................................................................................................................. 9

I.      Plaintiffs' Challenges to the Proclamation Are Not Justiciable ........................ 9

        A.      The Denial of Entry to an Alien Abroad is Reviewable Only for Violation
                of a U.S. Citizen's Own Constitutional Rights ...................................... 9

                1.      Plaintiffs' Statutory Challenges Are Not Reviewable ................ 9

                2.      Plaintiffs' Constitutional Claims Are Not Reviewable Because
                        Plaintiffs Do Not Assert Any Constitutional Rights of Their Own .......... 14

        B.      Plaintiffs Otherwise Fail to Satisfy Article III Requirements ............... 17

II.     Plaintiffs' Statutory Claims Are Not Likely to Succeed on the Merits ............. 18

        A.      The Proclamation Fits Well Within the President's Broad Constitutional and
                Statutory Authority to Suspend Entry of Aliens Abroad ....................... 18

                1.      The President Has Extremely Broad Discretion to Suspend Entry of
                        Aliens Abroad ......................................................................... 19

                2.      Under Any Standard, the Proclamation is Adequately Justified By
                        the President's National Security and Foreign Affairs Judgments ........... 22

                3.      Plaintiffs' Attempts to Limit the President's Authority are Incorrect ....... 26

        B.      The Proclamation Does Not Conflict With the Overall INA Scheme ................. 27

1.      Congressional Amendments to the INA Do Not Limit the President's
        Pre-Existing Statutory Authority ............................................................... 27

2.      The Proclamation Comports with the Provisions Plaintiffs Cite .............. 29

C.      The Proclamation Does Not Run Afoul of Section 1152(a)(1) ............................ 31

1.      Success On This Claim Would Not Support the Requested
        Injunction ................................................................................................. 31

2.      There Is No Conflict Between the Non-Discrimination Provision
        and the President's Suspension Authorities ............................................. 32

3.      In the Event of a Conflict, the President's Suspension Authorities
        Would Prevail ........................................................................................... 33

III.    The Proclamation Does Not Violate the Establishment Clause ........................................ 35

A.      The Proclamation Is Constitutional Under *Mandel* ................................................ 35

B.      The Proclamation is Valid Under Domestic Establishment Clause Precedent
        ............................................................................................................................... 39

IV.     The Remaining Preliminary Injunction Factors Weigh Against Relief ........................... 44

V.      A Global Injunction Would Be Inappropriate .................................................................. 45

CONCLUSION ............................................................................................................................... 45

## INTRODUCTION

Over the past several months, the Department of Homeland Security, in consultation with the Department of State and Director of National Intelligence, conducted a worldwide review of foreign governments' information-sharing practices and risk factors, evaluated each country according to a set of religion-neutral criteria, and identified countries with inadequate information-sharing practices. The Secretary of State then engaged countries diplomatically to encourage them to improve their performance. The Acting Secretary of Homeland Security reported the results of her review to the President, recommending that the President impose entry restrictions on nationals from eight countries whose information-sharing practices continued to be inadequate or that otherwise presented special risk factors. After reviewing the Acting Secretary's recommendations, and further consultations within the Executive Branch, the President crafted "country-specific restrictions" that, in his judgment, "would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur." Pursuant to broad constitutional and statutory authority to suspend or restrict the entry of aliens abroad when he deems it in the Nation's interest, on September 24, 2017, the President issued a Proclamation describing those restrictions and the particular country-conditions justifying them. *See* Proclamation No. 9645, *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public Safety Threats*, 82 Fed. Reg. 45,161 (Sept. 27, 2017).

Plaintiffs have now shown that, no matter how thorough the Government's process, they will continue to allege that the President's actions are motivated by animus. Plaintiffs ask this Court to enjoin the Proclamation worldwide, nullifying a formal national-security and foreign-policy directive of the President based on the extensive investigations and recommendations of several Cabinet Secretaries. Their request threatens the ability of this or any future President to

take steps that are necessary to protect the Nation.

To support their extraordinary request, Plaintiffs principally rely on the earlier decisions of this Court and the Fourth Circuit enjoining the temporary entry suspension in Executive Order No. 13,780.  But the Supreme Court has now vacated the Fourth Circuit's judgment and directed that the prior challenge be dismissed as moot.  *See Trump v. IRAP*, No. 16-1436, --- S. Ct. ----, 2017 WL 4518553 (Oct. 10, 2017).  Accordingly, this Court is free to reconsider the issues and correct the errors in those preliminary decisions.  Moreover, those decisions are inapposite even on their own terms, because the alleged flaws in the prior entry suspension do not apply to the Proclamation here, which was issued after a worldwide review employing neutral criteria.

The Proclamation here is amply justified by the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1).  The President determined that, for countries with inadequate information-sharing practices or presenting other special circumstances, it would be detrimental to the Nation's interests to allow certain foreign nationals of those countries to enter the United States, because "the United States Government lacks sufficient information to assess the risks they pose to the United States," and because the entry restrictions "are also needed to elicit improved identity-management and information-sharing protocols and practices from foreign governments[.]"  Procl. § 1(h)(i).  The President's determination is consistent with the broad discretion afforded him by §§ 1182(f) and 1185(a)(1).  Nor does the President's determination run afoul of any other Congressional enactment, which establish a *minimum* set of restrictions that an alien must meet before gaining entry to the country, but do not impliedly repeal the President's authority to impose *additional* restrictions when he deems it appropriate pursuant to §§ 1182(f) or 1185(a)(1).  Thus, Plaintiffs' statutory challenges should be rejected.

Likewise, Plaintiffs' Establishment Clause claim is governed by, and fails under,

*Kleindienst v. Mandel*, 408 U.S. 753 (1972), which requires upholding the Executive's decision to exclude aliens abroad so long as that decision rests on a "facially legitimate and bona fide reason." *Id*. at 770. The Proclamation's entry restrictions rest squarely on national-security and foreign-policy determinations by the President that are legitimate on their face and supported by extensive findings. *Mandel* precludes "look[ing] behind" the President's rationale. *Id*.

Plaintiffs' claim also fails without regard to *Mandel*. The Proclamation has nothing to do with religion on its face or in its operation, and Plaintiffs have not demonstrated that the Proclamation—the product of a review by multiple agencies—was motivated by religious animus. It was based on a thorough, worldwide review and engagement process that resulted in tailored, country-specific restrictions. Plaintiffs' theory would require this Court to impugn the motives of the numerous Cabinet Secretaries and other government officials who participated in the worldwide review that culminated in the Acting Secretary's recommendations to the President.

Accordingly, Plaintiffs' claims fail on the merits. Equally importantly, though, those claims are not justiciable at all, because the Proclamation has not produced final agency action on the visa applications filed by the aliens abroad identified by Plaintiffs, and Plaintiffs' challenges in any event are foreclosed by the general rule that federal courts may not second-guess the political branches' decisions to exclude aliens abroad. That principle plainly forecloses review of Plaintiffs' statutory challenges, because Congress has not authorized review of those claims. And although the Supreme Court has permitted limited review where a U.S. citizen contends that exclusion of an alien violates the citizen's own constitutional rights, Plaintiffs here do not assert a cognizable violation of their own rights under the Establishment or Equal Protection Clauses. Plaintiffs' motion for a preliminary injunction should therefore be denied.

## BACKGROUND

### I.     Legal Framework

"The exclusion of aliens is a fundamental act of sovereignty" that both is an aspect of the "legislative power" and also "is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

Under the INA, admission to the United States normally requires a valid visa or other valid travel document.  8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203.  Applying for a visa typically requires an in-person interview and results in a decision by a Department of State consular officer.  *Id.* §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. §§ 41.102, 42.62.  Although a visa generally is necessary for admission, it does not guarantee admission; the alien still must be found admissible upon arriving at a port of entry.  8 U.S.C. §§ 1201(h), 1225(a).  Congress has enabled certain nationals of certain countries to seek temporary admission without a visa under the Visa Waiver Program.  *Id.* §§ 1182, 1187.

Building upon the President's inherent authority to exclude aliens, *see Knauff*, 338 U.S. at 542, Congress has likewise accorded the President broad discretion to restrict the entry of aliens. Section 1182(f) of Title 8 authorizes the President to "suspend the entry of all aliens or any class of aliens" "for such period as he shall deem necessary" whenever he finds that such entry "would be detrimental to the interests of the United States."  Section 1185(a)(1) further empowers the President to adopt "reasonable rules, regulations," "orders," and "limitations and exceptions" on the entry of aliens.  Pursuant to these authorities, President Reagan suspended entry of all Cuban nationals in 1986, and President Carter denied and revoked visas to Iranian nationals in 1979.

### II.     Executive Order No. 13,780

On March 6, 2017, the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017) [hereafter "EO-2"].  Among other things, EO-2 directed the Secretary of Homeland

Security to conduct a global review to determine whether foreign governments provide adequate information about their nationals seeking U.S. visas.  *See* EO-2 § 2(a).  EO-2 directed the Secretary to report his findings to the President, after which nations identified as deficient would have time to alter their practices, prior to the Secretary recommending entry restrictions on nations that remained inadequate or presented other special circumstances.  *See id*. §§ 2(d)-(f).

During that review, EO-2 imposed a temporary, 90-day suspension on the entry of certain foreign nationals from six countries—Iran, Libya, Somalia, Sudan, Syria, and Yemen—all of which had been identified by Congress or the Department of Homeland Security (DHS) in connection with the Visa Waiver Program as presenting heighted terrorism-related concerns.  *See id*. § 2(c).  That 90-day suspension was challenged in multiple courts, and was preliminarily enjoined by this Court and one other district court.  *See IRAP v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017); *Hawaii v. Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017).  Those injunctions were affirmed in relevant part by the respective courts of appeals.  *See IRAP v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc); *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam).

The Supreme Court granted certiorari in both cases and partially stayed the injunctions pending its review.  *Trump v. IRAP*, 137 S. Ct. 2080 (2017).  After EO-2's temporary entry suspension expired, the Supreme Court vacated the *IRAP* injunction as moot.  *See Trump v. IRAP*, 2017 WL 4518553.

## III. The President's Proclamation

On September 24, 2017, following completion of the review and engagement processes required by Section 2 of EO-2, the President signed Proclamation No. 9645.  The Proclamation was based on a worldwide review of the nation's vetting procedures, reflects the recommendations of the Acting Secretary of DHS, and was issued in consultation with the Acting Secretary, the Secretary of State, the Secretary of Defense, and the Attorney General.  *See* Procl. § 1(h)(i).

**A.      DHS's Worldwide Review and Recommendations**

The Proclamation describes the elaborate review process conducted pursuant to Section 2 of EO-2.  First, DHS, in consultation with the Department of State and the Director of National Intelligence, determined the information needed from foreign governments to enable the United States to assess its ability to make informed decisions about foreign nationals applying for visas. That information "baseline" has three components:

> (1) identity-management information, to assess "whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports";
>
> (2) national-security and public-safety information, to determine "whether the country makes available . . . known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information"; and
>
> (3) a national-security and public-safety risk assessment, including such factors as "whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program . . . that meets all of [the program's] requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States."[1]

In conjunction with developing these criteria, DHS, in coordination with the Department of State, collected data on, and evaluated, every foreign country according to the criteria.  Out of the nearly 200 countries evaluated, the Acting Secretary of DHS identified the information-sharing practices and risk factors of 16 countries as "inadequate."  *See* Procl. § 1(e).  Another 31 countries were classified as "at risk" of becoming "inadequate."  *See id.*  These preliminary results were

---

[1] Procl. § 1(c); *see also* DHS, Fact Sheet: The President's Proclamation on Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats (Sept. 24, 2017), https://www.dhs.gov/news/2017/09/24/fact-sheet-president-s-proclamation-enhancing-vetting-capabilities-and-processes.

submitted to the President on July 9.  *See id.* § 1(c).  The Department of State then conducted a 50-day engagement period to encourage all foreign governments to improve their performance. These diplomatic efforts yielded significant gains.[2]

After the engagement period ended, the Acting Secretary of DHS submitted a report to the President recommending tailored entry restrictions on certain nationals from seven countries (Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen) that continue to be "inadequate" with respect to providing information to the United States and risk factors.  *See id.* § 1(h)(ii).  The Acting Secretary also recommended entry restrictions on nationals of Somalia.  Although Somalia generally satisfied the information-sharing criteria, the Acting Secretary found that the Somali government's inability to effectively and consistently cooperate, as well as the terrorist threat that emanates from its territory, present special circumstances warranting limitations on entry.  *See id.* § 1(i).  The Acting Secretary also determined that an eighth country (Iraq) did not meet the United States' information-sharing requirements, but in lieu of entry restrictions, recommended additional scrutiny of Iraqi nationals seeking entry because of the United States' close cooperative relationship with Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combatting ISIS.  *See id.* § 1(g).

**B.     The President's Findings and Suspensions of Entry**

On September 24, 2017, after considering the Acting Secretary's recommendations and "consult[ing] with appropriate Assistants to the President and members of the Cabinet," Procl. § 1(h)(i), the President issued the Proclamation pursuant to his inherent and statutory authority, including 8 U.S.C. §§ 1182(f) and 1185(a)(1).  The President considered "several factors, including each country's capacity, ability, and willingness to cooperate with our identity-management and

---

[2] For example, 29 countries produced travel-document exemplars to combat fraud, and 11 countries agreed to share information on known or suspected terrorists.  *See* Procl. § 1(f).

information-sharing policies and each country's risk factors," as well as "foreign policy, national security, and counterterrorism goals." *Id.* With those factors and goals in mind, the President sought to "craft[] those country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur." *Id.*

Accordingly, for countries that refuse to cooperate regularly with the United States (Iran, North Korea, and Syria), the Proclamation suspends entry of nationals seeking both immigrant and nonimmigrant visas; all classes of nonimmigrant visas are suspended for North Korea and Syria, and all are suspended for Iran except student (F and M) and exchange visitor (J) visas. *See id.* §§ 2(b)(ii), (d)(ii), (e)(ii). For countries that are valuable counter-terrorism partners but nonetheless have information-sharing deficiencies (Chad, Libya, and Yemen), the Proclamation suspends entry only of persons seeking immigrant visas and business, tourist, and business/tourist nonimmigrant (B-1, B-2, B-1/B-2) visas. *Id.* §§ 2(a)(ii), (c)(ii), (g)(ii). For Somalia, the Proclamation suspends entry of persons seeking immigrant visas, and requires additional scrutiny of nationals seeking nonimmigrant visas. *Id.* § 2(h)(ii). And for Venezuela, the Proclamation suspends entry of "officials of government agencies of Venezuela involved in screening and vetting procedures" and "their immediate family members" on nonimmigrant business and tourist visas. *Id.* § 2(f)(ii). For each country, the Proclamation summarizes some of the particular country conditions and inadequacies warranting the restrictions. *See generally id.* § 2. The Proclamation also provides for case-by-case waivers to the entry restrictions. *Id.* § 3(c).

The restrictions imposed on each country are "to encourage cooperation" and to "protect the United States until such time as improvements occur." *Id.* § 1(h)(i); *see also* Procl. pmbl. To that end, the Proclamation requires an ongoing review process to determine whether the limitations

imposed should be continued, terminated, modified, or supplemented.  *Id.* § 4.  If at any time the Secretary of DHS determines that certain restrictions "are no longer necessary for the security or welfare of the United States, the Secretary . . . may recommend to the President the removal or modification of any or all such restrictions and limitations." *Id.* § 4(c).

The suspensions on entry were effective immediately for foreign nationals previously restricted under EO-2 and the Supreme Court's stay order.  *Id.* § 7(a).  The entry restrictions will be effective at 12:01 a.m. EDT on October 18, 2017 for all other covered persons.  *Id.* § 7(b).

## STANDARD OF REVIEW

Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that [the relief] is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.       Plaintiffs' Challenges to the Proclamation Are Not Justiciable

It is a fundamental separation-of-powers principle that the political branches' decisions to exclude aliens abroad generally are not judicially reviewable.  That principle bars any review of Plaintiffs' statutory claims.  The Supreme Court has permitted limited review only when a U.S. citizen asserts a claim that exclusion of an alien abroad infringes the citizen's own constitutional rights.  Here, although Plaintiffs invoke the Establishment and Equal Protection Clauses, they assert no cognizable violation of their *own* constitutional rights.  Thus, Plaintiffs' claims are not reviewable.  Plaintiffs also do not otherwise meet Article III requirements.

#### A.       The Denial of Entry to an Alien Abroad is Reviewable Only for Violation of a U.S. Citizen's Own Constitutional Rights

##### 1.       Plaintiffs' Statutory Challenges Are Not Reviewable

**a.**  The Supreme Court "ha[s] long recognized the power to . . . exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."  *Fiallo v. Bell*, 430 U.S. 787, 792 (1977).  "[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien."  *Knauff*, 338 U.S. at 543.  Absent such affirmative authorization, however, judicial review of exclusion of aliens outside the United States is ordinarily unavailable.

Courts have distilled from these fundamental and longstanding principles of nonreviewability the rule that the denial or revocation of a visa for an alien abroad "is not subject to judicial review . . . unless Congress says otherwise."  *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999).  Courts have referred to that rule as "the doctrine of consular nonreviewability," *id.*, but the short-hand label merely reflects the context in which the principle most often arises—*i.e.*, challenges to decisions by consular officers adjudicating visa applications. The principle underlying that doctrine applies regardless of the manner in which the Executive denies entry to an alien abroad.  Contrary to Plaintiffs' position, *see* IRAP Br. at 23, it would make no sense to bar review of consular officers' case-specific determinations while permitting review of decisions by the Head of the Executive Branch that are grounded in sensitive foreign-affairs and national-security determinations.  *See Saavedra Bruno*, 197 F.3d at 1159-60.

Congress has declined to provide for judicial review of decisions to exclude aliens abroad. It has not authorized any judicial review of visa denials—even by the alien affected, much less by third parties like Plaintiffs here.  *E.g.*, 6 U.S.C. § 236(f); *see id.* § 236(b)(1), (c)(1).  Congress also has forbidden "judicial review" of visa revocations (subject to a narrow exception inapplicable to aliens abroad).  8 U.S.C. § 1201(i).  This longstanding bar on judicial review of the political

branches' exclusion of aliens abroad forecloses Plaintiffs' statutory challenges to the Proclamation.

**b.**   Plaintiffs erroneously assert that Congress has authorized judicial review of their statutory claims under the Administrative Procedure Act (APA).  *See* IRAP Br. at 23.  The APA does not apply "to the extent that . . . statutes preclude judicial review," 5 U.S.C. § 701(a)(1), which "is determined not only from [a statute's] express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  Moreover, § 702 itself contains a "qualifying clause" that preserves "other limitations on judicial review" that predated the APA.  *Saavedra Bruno*, 197 F.3d at 1158 (quoting 5 U.S.C. § 702(1)).  Here, the conclusion is "unmistakable" from history that "the immigration laws 'preclude judicial review' of []consular visa decisions."  *Id.* at 1160.  At a minimum, the general rule of "nonreviewability . . . represents one of the 'limitations on judicial review' unaffected by § 702's opening clause[.]"  *Id.*

Indeed, when the Supreme Court held that aliens physically present in the United States— but not aliens abroad—could seek review of their exclusion orders under the APA, *see Brownell v. Tom We Shung*, 352 U.S. 180, 184-86 (1956), Congress responded by abrogating that ruling.  *See* Act of Sept. 26, 1961, Pub. L. No. 87-301, § 5(a), 75 Stat. 651-653; *Saavedra Bruno*, 197 F.3d at 1157-62 (recounting history).  The House Report accompanying the abrogating statute explained that APA suits would "give recognition to a fallacious doctrine that an alien has a 'right' to enter this country which he may litigate in the courts of the United States against the U.S. Government as a defendant."  H.R. Rep. No. 1086, 87th Cong., 1st Sess., at 33 (1961).  Because an alien present in the United States cannot invoke the APA to obtain review—as Congress prescribed in 1961— then *a fortiori*, neither can aliens abroad or U.S. citizens acting at their behest.  And given that Congress generally foreclosed "judicial review" of visa revocations, 8 U.S.C. § 1201(i), it is

implausible that Congress would allow review of visa denials in the first instance.

**c.**  Plaintiffs assert that *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), in which

the Court reviewed a challenge by aliens abroad to measures returning them to their home country,

shows that Plaintiffs' statutory claims are reviewable.  *See* IRAP Br. at 22.  In that case, however,

the Court did not address reviewability because it rejected the plaintiffs' claims on the merits.

Moreover, the aliens in *Sale* alleged that the INA and a treaty gave them a judicially enforceable

right.  Here, Plaintiffs have no such colorable claim, as discussed below.[3]

**d.**  Even if the general rule of nonreviewability did not foreclose judicial review of

Plaintiffs' statutory claims, review still would be unavailable for three reasons.  First, the APA

provides for judicial review only of "final agency action."  5 U.S.C. § 704.  The President's

Proclamation is not "agency action" at all, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01

(1992); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403-

04 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012), and there has been no final decision denying

a visa based on the Proclamation to any of the aliens abroad identified by Plaintiffs.  In general,

they appear either to be awaiting a visa interview, or have had an interview and not been issued a

visa, presumably meaning that the visa has been refused subject to further review for reasons

---

[3] Plaintiffs also incorrectly argue that *Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986), holds that statutory challenges to the exclusion of aliens abroad can be considered where constitutional claims also are asserted, due to the canon of constitutional avoidance.  IRAP Br. at 24.  But, as the D.C. Circuit subsequently recognized in *Saavedra Bruno*, *Abourezk*'s reviewability holding critically relied on a statute that has since been amended to eliminate such review.  *See Saavedra Bruno* 197 F.3d at 1162, 1164.  Moreover, the principle that courts should "'not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of,'" applies only if a non-constitutional ground is "'present.'"  *Pearson v. Callahan*, 555 U.S. 223, 241 (2009).  The constitutional-avoidance principle does not rehabilitate unreviewable statutory claims.  *See Doe*, 486 U.S. at 600-605 (constitutional claims reviewable but statutory claims not reviewable under APA).

unrelated to the Proclamation. *See* 22 C.F.R. §§ 41.121(a), 42.81(a); *see also* IRAP Br. at 9; IAAB Br. at 2-4; Zakzok Br. at 2-7. Those aliens, moreover, if otherwise found eligible for a visa, will have an opportunity to seek a waiver as provided by the Proclamation. Even if judicial review were ultimately available, therefore, it would not lie until a consular officer has made a final decision to deny a visa, which could be based on a ground unrelated to the Proclamation. Even in *Mandel* and *Kerry v. Din*, 135 S. Ct. 2128 (2015), courts did not consider the constitutional claims until after the aliens had been denied visas.[4]

Second, Plaintiffs lack a statutory right to enforce. Nothing in the INA gives Plaintiffs a direct right to judicial review. *See, e.g.*, *Abourezk*, 785 F.2d at 1050; *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1505 (11th Cir. 1992). And the APA's "general cause of action" exists only for "persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Community Nutrition Inst.*, 467 U.S. at 345. None of the statutes here provides Plaintiffs any rights to invoke. The provisions empowering the President to restrict entry of aliens, 8 U.S.C. §§ 1182(f), 1185(a)(1), and prohibiting nationality-based discrimination in the issuance of immigrant visas, *id.* § 1152(a)(1)(A), do not confer any rights on third parties like Plaintiffs here— *i.e.*, U.S. organizations or persons seeking entry of aliens abroad.[5]

Finally, the APA also does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here, the relevant statutes commit these matters

---

[4] Contrary to the *Zakzok* plaintiffs' assumptions, *see* Zakzok Br. at 8, nothing in the Proclamation will suspend processing or consideration of I-130 petitions even after October 18.

[5] Even when the INA permits a U.S. person to file a petition for a foreign family member's classification as a relative for immigrant status, any interest the U.S. person has "terminate[s]" "[w]hen [his] petition [i]s granted." *Saavedra Bruno*, 197 F.3d at 1164. Nothing in the INA authorizes a sponsoring citizen to challenge the later denial of a visa to his relative.

to the President's unreviewable discretion.  *See* Part II.A.1, *infra*.[6]

### 2. Plaintiffs' Constitutional Claims Are Not Reviewable Because Plaintiffs Do Not Assert Any Constitutional Rights of Their Own

The Supreme Court has twice engaged in limited judicial review of constitutional claims, but only when a U.S. citizen contended that the exclusion of an alien abroad violated the citizen's own constitutional rights.  In *Mandel*, the Court reviewed a claim that the denial of a waiver of visa-ineligibility to a Belgian national violated U.S. citizens' own First Amendment right to receive information.  408 U.S. at 756-59, 762-70.  As the Court explained, the alien himself could not seek review because he "had no constitutional right of entry to this country."  *Id*. at 762.  The Court addressed (and rejected on the merits) only the claim of U.S. citizens that the alien's exclusion violated their own constitutional rights.  *Id*. at 770.  And in *Din*, the Court considered but denied a claim by a U.S. citizen that the refusal of a visa to her husband violated her own due-process rights. 135 S. Ct. at 2131 (opinion of Scalia, J.); *id*. at 2139 (Kennedy, J., concurring in the judgment). Limited review was available in each case only because the plaintiffs asserted violations of their own constitutional rights as U.S. citizens.

Plaintiffs allege that they are injured by the Proclamation because it will prevent or delay their family members' entry into the United States and thereby prolong their separation.  *See* IRAP Br. 9-10; IAAB Br. 4-5; Zakzok Br. 8.  But putting aside that no visa has yet been denied based on the Proclamation and this claim is therefore not ripe, that claimed injury is not cognizable in any event because it does not stem from an alleged infringement of Plaintiffs' *own* constitutional rights.

---

[6] Plaintiffs briefly assert that judicial review is available through equity.  IRAP Br. at 23 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384-85 (2015)).  But the "judge-made remedy" that *Armstrong* addressed does not permit Plaintiffs to sidestep "express and implied statutory limitations" on judicial review, such as under the APA.  135 S. Ct. at 1384-85.  A contrary rule would eviscerate the APA's limits on review.  Indeed, a suit for equitable relief challenging agency action is specifically contemplated as one under the APA itself, 5 U.S.C. § 703, not outside of it.  *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967).

In *McGowan v. Maryland*, 366 U.S. 420 (1961), the Supreme Court held that individuals who are indirectly injured by alleged religious discrimination against others generally may not sue, because they have not suffered violations of their own. *Id*. at 429-30. The Court concluded that the plaintiffs, employees of a store subject to a State's Sunday-closing law, lacked standing to challenge that law on free-exercise grounds because they "d[id] not allege any infringement of their own religious freedoms." *Id*. at 429. Likewise here, in challenging the application of the Proclamation to family members (or to family members of the organizational plaintiffs' clients), Plaintiffs are not asserting violations of their own constitutional rights. They instead are seeking to advance the interests of third parties whose entry is suspended and who themselves have no constitutional rights. Plaintiffs thus cannot seek the limited review afforded in *Mandel* and *Din*.[7]

Plaintiffs also claim that the Proclamation injures them by sending a "message" that condemns their Islamic faith. *See* IRAP Br. at 8-9; IAAB Br. at 5-6; Zakzok Br. at 8. This "message" injury is not cognizable either because it likewise does not result from a violation of Plaintiffs' own constitutional rights. The Supreme Court has "ma[de] clear" that "the stigmatizing injury often caused by racial [or other invidious] discrimination . . . accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984). The same rule applies to Establishment Clause claims: "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not the type of "personal injury" that supports standing to sue, "even

---

[7] *McGowan* held that the plaintiffs could assert an Establishment Clause challenge to the state law only because they suffered "direct . . . injury, allegedly due to the imposition on them of the tenets of the Christian religion": they were subjected to (indeed, prosecuted under) a Sunday-closing law, which regulated their own conduct. 366 U.S. at 422, 430-31; *see Two Guys From Harrison-Allentown, Inc. v. McGinley*, 366 U.S. 582, 583 n.1, 585-86 (1961) (reviewing challenge to Sunday-closing law where business sought to prevent application of the law to business itself). That contrasts with the indirect injury from alleged discrimination here against aliens abroad.

though the disagreement is phrased in [Establishment Clause] terms." *Valley Forge Christian Coll.*

*v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 85-86 (1982).

To be sure, a plaintiff may suffer a "spiritual" injury from the violation of his own Establishment Clause rights where he himself has been "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them." *Valley Forge*, 454 U.S. at 486-487 n.22. But neither is true here. The Proclamation does not expose Plaintiffs to a religious message: it says nothing about religion, and does not subject them to any religious exercise. And the Proclamation applies only to certain aliens abroad and is not targeted at Plaintiffs.

The D.C. Circuit correctly has rejected the notion that a putative Establishment Clause plaintiff may "re-characterize[]" an abstract injury flowing from "government *action*" directed against others as a personal injury from "a governmental *message* [concerning] religion" directed at the plaintiff. *In re Navy Chaplaincy*, 534 F.3d 756, 764 (2008) (Kavanaugh, J.), *cert. denied*, 556 U.S. 1167 (2009). If that were permissible, the D.C. Circuit explained, it would "eviscerate well-settled standing limitations." *Id*. The challengers in *Valley Forge* and other cases "could have obtained standing to sue simply by targeting not the government's action, but rather the government's alleged 'message' of religious preference communicated through that action." *Id*. Plaintiffs' theory that a neutral regulation of conduct can be recast as sending an implicit religious message would render *Valley Forge*'s rule an empty pleading requirement.

Indeed, even the Fourth Circuit declined to hold that the *IRAP* plaintiffs' "message" injury was sufficient to support their Establishment Clause claim, instead relying on the *combination* of EO-2's purported message and its adverse effect on one plaintiff in delaying the entry of his spouse. *See IRAP*, 857 F.3d at 583-86 & n.11. But again, the Fourth Circuit erred because it confused the question whether an individual has suffered *an injury-in-fact* from an alleged violation of the

Establishment Clause with the question whether that violation was of the individual's *own Establishment Clause rights*. *See id*. at 586. The Supreme Court has never conflated the two. Regardless of injury-in-fact, a plaintiff still must allege a violation of his own constitutional rights to invoke the limited review afforded by *Mandel* and *Din*. Because Plaintiffs have not done so, their constitutional claims are not reviewable.

### B.   Plaintiffs Otherwise Fail to Satisfy Article III Requirements

**1.** Even if Plaintiffs' claims are reviewable, they are premature. If any plaintiff's relative is denied both a visa and a waiver, then that plaintiff can bring suit and the Court can consider the challenge in a concrete dispute. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"); *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013).

Two organizational plaintiffs—MESA and IAAB—claim injury associated with the Proclamation's alleged interference with their conferences featuring international students and scholars. *See* IRAP Br. at 10 (MESA); IAAB Br. at 6 (IAAB). But neither MESA nor IAAB identifies any specific scholar or student who has concrete plans to attend an event but would be prohibited from doing so by the Proclamation. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Plaintiffs also make no effort to explain how their conferences will be harmed notwithstanding the fact that the entry of Iranian nationals on student (F and M) and exchange visitor (J) visas, including visas for short-term scholars, has not been suspended. *See generally* 22 C.F.R. § 62.21. As it stands now, none of the individual or organizational plaintiffs has adequately established claims that satisfy Article III's requirements for review.

**2.** The organizational plaintiffs also claim injury based on alleged diversion of resources in response to the Proclamation. *See* IRAP Br. at 10 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). But *Havens Realty* involved a narrow type of injury, in which the plaintiff

organization itself had a statutory right to truthful housing information, *see* 455 U.S. at 373, and the defendants' "racially discriminatory steering practices" made it impossible for the organization to fulfill its mission. *Id.* at 379. By its own terms, *Havens Realty* does not provide Article III injury-in-fact any time there is "a setback to the organization's abstract social interests[.]" *Id.*

Here, the organizations' alleged harms—diversion of resources "to counsel clients and respond to questions" about the Proclamation, and individuals from the affected countries no longer seeking the organization's "immigration services," IRAP Br. at 10—are exactly the type of abstract injuries that do not support standing under *Havens Realty*. *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (rejecting standing for "an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation"). And an entity that provides legal services to aliens and other clients is not within the zone of interests of the immigration statutes. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *Air Courier Conference of Am. v. American Postal Workers Union, AFL-CIO*, 498 U.S. 517, 524-525 (1991).

**3.** Finally, the plaintiff organizations claim third-party standing to represent the interests of their clients. *See* IRAP Br. at 10. As Plaintiffs note, however, third-party standing requires both the third party and the litigant itself to have suffered an injury in fact. *Id.* (citing *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)). Because the organizations have not been injured and they have not identified any client with an Article III injury, the organizations also lack third-party standing.

## II. Plaintiffs' Statutory Claims Are Not Likely to Succeed on the Merits

### A. The Proclamation Fits Well Within the President's Broad Constitutional and Statutory Authority to Suspend Entry of Aliens Abroad

The President's Proclamation was issued pursuant to his Article II constitutional authority, and the broad statutory authority vested in him by 8 U.S.C. §§ 1182(f) and 1185(a)(1). The plain

text of those statutes confirms the expansive discretion afforded to the President, and historical practice likewise confirms that the President need not offer detailed justifications for his entry suspensions.  Judicial review of the President's determinations would therefore be inappropriate. Regardless, the Proclamation here satisfies any standard that could plausibly apply, including the standard erroneously adopted by the Ninth Circuit in *Hawaii*.

>    1.    **The President Has Extremely Broad Discretion to Suspend Entry of Aliens Abroad**

**a.**  As relevant here, Section 1182(f) provides the following:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).  By its terms, this provision grants the President broad authority and confirms his discretion at every turn.  Indeed, at least four courts of appeals have recognized that § 1182(f) provides the President with broad power to suspend the entry of aliens.  *See Abourezk*, 785 F.2d at 1049 n.2; *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992); *Allende v. Shultz*, 845 F.2d 1111, 1117-1118 (1st Cir. 1988); *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980).  The Supreme Court itself has deemed it "perfectly clear that [Section] 1182(f) . . . grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores."  *Sale*, 509 U.S. at 187.[8]

---

[8] Notably, when the Immigration and Nationality Act of 1952 was being drafted and debated, opponents criticized § 1182(f) as "giv[ing] the President the power to suspend all immigration whenever he feels it is in the national interest to do so," 98 Cong. Rec. 4249 (1952) (letter from Rhoads Murphey, Friends Comm. on National Legislation), and as a "very, very broad provision," *id.* at 4304-4305, 4423, 5114 (statements of Reps. Celler and Multer and Sen. Lehman); *see also* S. Rep. No. 1137, 82d Cong., 2d Sess. Pt. 2, at 4 (1952) (minority views).  The legislators supporting the provision did not disagree or suggest otherwise.  *See* S. Rep. No. 1137, 82d Cong., 2d Sess., at 14 (1952); H. Rep. No. 1365, 82d Cong., 2d Sess., at 53 (1952).

In addition to § 1182(f), 8 U.S.C. § 1185(a) further provides:

> Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe[.]

8 U.S.C. § 1185(a)(1).   This statutory text likewise confirms the breadth of the President's authority.   This section does not require any predicate findings whatsoever, but simply gives the President the authority to restrict entry to the United States according to "such limitations and exceptions as the President may prescribe." *Id.*; *see also Haig v. Agee*, 453 U.S. 280, 297 (1981) (construing similar language in §1185(b) as "le[aving] the power to make exceptions exclusively in the hands of the Executive"); *Allende*, 845 F.2d at 1118 & n.13.[9]

**b.**   Based on those statutes' plain text, they provide no basis for judicial second-guessing of the President's determinations about what restrictions to "prescribe" or what restrictions are necessary to avoid "detriment[] to the interests of the United States."   Congress specifically committed those matters to the President's judgment and discretion.   Indeed, because the statutes "fairly exude[] deference to the [President]" and "appear[] . . . to foreclose the application of any meaningful judicial standard of review," it would be inappropriate for this Court to second-guess the nature of the President's restrictions or their basis.   *Webster v. Doe*, 486 U.S. 592, 600 (1988); *see also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) ("The Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country

---

[9] The history of § 1185(a) also confirms the expansive discretion provided to the President. It originated in 1918 as a wartime measure authorizing restrictions "if the President shall find that the public safety requires" them.   40 Stat. 559 (1918).   In 1978, Congress broadened the statute by removing the wartime requirement, and by removing *any* predicate finding from the statute.   *See* Pub. L. No. 95-426, sec. 707(a), 92 Stat. 963, 992-93 (1978).

by focusing on that country's nationals—and even if it did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy.") [hereafter *AAADC*]. Thus, the President's determinations are "not subject to review," *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940), and holding otherwise could severely limit the Executive Branch's ability to respond quickly to urgent threats or international crises.[10]

    **c.**   Historical practice likewise confirms the breadth of and deference owed to the President's authority.   For decades Presidents have restricted entry pursuant to §§ 1182(f) and 1185(a)(1) without detailed public justifications or findings; some have discussed the President's rationale in one or two sentences that broadly declare the Nation's interests.[11]  Indeed, Executive Order No. 12,807—the Presidential action at issue in *Sale*—contained only a single sentence justifying its measures.  *See* Exec. Order No. 12,807, pmbl. pt. 4 (1992) ("There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally.").  But the Supreme Court expressed no concerns about the adequacy of that finding, and instead remarked on the "ample power" given to the President, noting that "[w]hether the President's chosen method" made sense from a policy perspective was "irrelevant to the scope of his authority" under the statute.  *Sale*, 509 U.S. at 187-88.

    Similarly, in 1979 when President Carter invoked § 1185(a)(1) to restrict Iranian nationals, the Executive Order made no findings whatsoever and delegated the authority to prescribe

---

[10] Plaintiffs assert that § 1185(a)(1) "requires that any conditions on entry be 'reasonable,'" IRAP Br. at 14 n.7.  But the word "reasonable" does not appear in the operative grant of authority in that subsection—"subject to such limitations and exceptions as the President may prescribe"— and, regardless, § 1182(f) does not even arguably contain such a requirement.  In any event, the Proclamation's conditions are plainly reasonable, as explained *infra* in Part II.A.2.

[11] *See, e.g.*, Proclamation No. 8693 (July 27, 2011); Proclamation No. 8342 (Jan. 22, 2009); Proclamation No. 6958 (Nov. 26, 1996); Proclamation No. 5887 (Oct. 26, 1988); Proclamation No. 5829 (June 14, 1988).

restrictions to lower Executive Branch officials.  *See* Exec. Order No. 12,172, § 1-101 (Nov. 26, 1979).  Courts saw no impediment to upholding those actions, despite the complete absence of Presidential findings regarding the necessity of any particular restrictions.  *See Nademi v. INS*, 679 F.2d 811, 813-14 (10th Cir. 1982); *Yassini v. Crosland*, 618 F.2d 1356, 1362 (9th Cir. 1980).

### 2.      Under Any Standard, the Proclamation is Adequately Justified By the President's National Security and Foreign Affairs Judgments

**a.**  Even assuming some limited form of judicial review were appropriate, the Proclamation here would readily be sustained.  The President provided far more detail and explanation for his findings than exists in other Presidential suspensions under §§ 1182(f) or 1185(a).  Specifically, the President imposed the entry restrictions after reviewing the recommendations of the Acting Secretary of DHS, and her recommendations were created following a worldwide review that evaluated every country according to neutral criteria.  The Acting Secretary recommended entry restrictions on eight countries, each of which was identified as "inadequate" in its information-sharing practices or as presenting other special circumstances.  *See* Procl. §§ 1(c)-(g), (i).  Moreover, the entry restrictions for each country are tailored to the country's particular circumstances and conditions.  *See id.* §§ 1(h)(1), 2(a)-(h).

The President's entry restrictions serve two purposes.  First, the restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States."  *Id.* § 1(h)(i); *see also id.* § 1(a)-(b) (discussing the importance of foreign countries' information-sharing to the overall security vetting process).  Second, the restrictions place pressure on foreign governments "to work with the United States to address those inadequacies and risks so that the restrictions and limitations imposed by this proclamation may be relaxed or removed as soon as possible."  *Id.* § 1(h).  The utility of the entry restrictions as a foreign-policy tool is confirmed by the history of

the Proclamation's development—during the diplomatic engagement period, the prospect of entry restrictions yielded significant improvements in foreign countries' information-sharing practices. *Id.* §§ 1(e)-(g).  Iraq similarly improved its information-sharing following the January 27, 2017 Executive Order, and thus was removed from EO-2's entry suspension.  *See* EO-2 § 1(g).  The Proclamation amply survives review in light of these dual purposes of security and foreign-relations, the latter of which is an independent rationale that Plaintiffs wholly ignore.

**b.**  Plaintiffs argue that the Proclamation fails for the same reasons EO-2 failed before the Ninth Circuit in *Hawaii* and before Judge Keenan in *IRAP*.  *See* IRAP Br. at 17-19 (citing *Hawaii*, 859 F.3d at 770-74; *IRAP*, 857 F.3d at 609-11 (Keenan, J., concurring)).  But the Proclamation would indeed satisfy even the standards (erroneously) applied in those opinions.

*First*, the Ninth Circuit held that EO-2 made "no finding that nationality alone renders entry of this broad class of individuals a heightened security risk to the United States."  *Hawaii*, 859 F.3d at 772 (citing *IRAP*, 857 F.3d at 610 (Keenan, J., concurring)).  But the Proclamation here contains such findings.  Regarding security threats, the Proclamation explains that "[s]creening and vetting protocols" play "a critical role" in protecting United States citizens "from terrorist attacks and other public-safety threats," Procl. § 1(a); that "[i]nformation-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of th[os]e screening and vetting protocols," *id.* § 1(b); that each of the eight countries was determined to have "inadequate" practices under DHS's baseline criteria or to present other special circumstances, *id.* § 1(g); and therefore the Proclamation's restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States," *id.* § 1(h)(i).  These findings necessarily apply on the basis of nationality, because it is the inadequacy of the foreign

governments' practices that creates the risk inherent in those persons' entry.  *See id.* § 1(b).

Similarly, with respect to foreign relations, the Proclamation explains that the entry restrictions are intended to "elicit improved identity-management and information-sharing protocols and practices from foreign governments" going forward.  Procl. § 1(h)(i); *see id.* § 1(b).  When trying to influence the behavior of a foreign government, it makes eminent sense to distinguish, at least in part, on the basis of nationality.  The Ninth Circuit itself acknowledged the rationality of distinguishing among "classes of aliens on the basis of nationality" when necessary "as retaliatory diplomatic measures responsive to government conduct directed at the United States."  *Hawaii*, 859 F.3d at 772 n.13.  And the Fourth Circuit has similarly upheld nationality-based restrictions in such circumstances.  *See Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981) (upholding restrictions against Iranian nationals because "[t]he United States is not bound to treat the nationals of unfriendly powers with the same courtesy and consideration it extends to nationals of friendly powers"); *see also, e.g.*, *Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979); *cf. Harisiades v. Shaughnessy*, 342 U.S. 580, 585-88 (1952).  Thus, the Proclamation contains ample findings justifying restrictions on the basis of nationality.[12]

*Second*, the Ninth Circuit faulted EO-2's use of nationality because it was over-inclusive, suspending entry even for "nationals without significant ties to the six designated countries[.]"  *Hawaii*, 859 F.3d at 773.  As the Proclamation explains, however, "the "practices of foreign

---

[12] The Ninth Circuit also faulted EO-2 because it did not "tie these nationals" to "terrorist organizations," "identify these nationals as contributors to active conflict," or show a "link between an individual's nationality and their propensity to commit terrorism."  *Hawaii*, 859 F.3d at 772.  To the extent the Ninth Circuit was implying that the President must make an individualized risk determination as to each particular national excluded, that would plainly conflict with the statutes here, which permit the President to make his determinations on a categorical basis.  *See* 8 U.S.C. § 1182(f) (authorizing the President to "suspend the entry of *all aliens or any class of aliens*"), § 1185(a)(1) (prohibiting "*any alien*" from entering except pursuant to "such limitations and exceptions as the President may prescribe") (emphases added).

governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States," because the governments "manage the identity and travel documents of their nationals," and "also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information." Procl. § 1(b). Those risks—regarding adequate information-sharing practices and identity-management protocols—apply regardless of the degree of a foreign national's connection to his or her country of citizenship.

*Third*, the Ninth Circuit noted that EO-2 did not "make[] any finding that the current screening processes are inadequate." *Hawaii*, 859 F.3d at 773; *see also IRAP*, 859 F.3d at 611 (Keenan, J., concurring). But the Proclamation expressly contains such a finding; the Acting Secretary's worldwide review was designed "to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country . . . in order to determine that the individual is not a security or public-safety threat," Procl. § 1(c), and after being evaluated under that standard each of the eight countries here was found to have *inadequate* information-sharing practices or to present other particular risks, *id.* §§ 1(g), (i). Thus, the President (and Acting Secretary) indeed found that current procedures are inadequate with respect to the eight countries—*i.e.*, the United States does not have enough information under current procedures "to determine that the individual is not a security or public-safety threat," or to "assess the risks they pose to the United States[.]" *Id.* § 1(c), (h)(i); *see also* Procl. pmbl. Furthermore, the President found that the status quo was inadequate to encourage greater cooperation from the eight nations. *See id.* § 1(h)(i) ("These restrictions and limitations are also *needed* to elicit improved identity-management and information-sharing protocols and practices from foreign governments[.]" (emphasis added)). Thus, the President found the current

procedures to be inadequate for purposes of vetting nationals from these eight countries and encouraging greater cooperation from these eight countries' governments.[13]

*Fourth* and finally, Judge Keenan faulted EO-2's temporary suspension because it was issued prior to DHS completing its review of whether foreign nationals' entry would harm the United States. *See* 857 F.3d at 611. Of course, the Acting Secretary's comprehensive review has now been completed, and the results of that review are the foundation for the Proclamation's entry restrictions. *See* Procl. §§ 1(c)-(h). The completion of that review is itself a "changed circumstance" justifying imposition of the Proclamation's tailored restrictions. IRAP Br. at 17.

In sum, because the Proclamation thoroughly explains its findings and the bases for its conclusions, it should be upheld under any standard of review—including under the type of scrutiny employed by the Ninth Circuit and by Judge Keenan.

### 3.    Plaintiffs' Attempts to Limit the President's Authority are Incorrect

Finally, Plaintiffs suggest two ways in which the President's statutory authority should be limited such that (in their view) the Proclamation is invalid. Neither argument is persuasive.

**a.** Plaintiffs first suggest that the President's authority under §§ 1182(f) and 1185(a) should be construed narrowly in light of the non-delegation doctrine. *See* IRAP Br. at 12-13. But this argument is squarely foreclosed by *Knauff*, which rejected a non-delegation challenge to the predecessor version of § 1185(a)(1) because the exclusion of aliens also "implement[s] an inherent executive power." 338 U.S. at 542.

**b.** Plaintiffs also argue that §§ 1182(f) and 1185(a) may be used only to respond to "a

---

[13] Plaintiffs fault the Proclamation for not citing "a single vetting error of any kind for the banned countries[.]" IRAP Br. at 17. But this retrospective standard—requiring a past mistake in order to justify a prospective change in policy—ignores that national-security judgments are (and must be) predictive and preventive. *Cf. Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988). Contrary to Plaintiffs' suggestion, the President need not await a tragic event to act prophylactically.

diplomatic event Congress did not and could not practicably address," or "a threat to U.S. interests to which Congress ha[s] not already responded." IRAP Br. at 13. But this limitation finds no basis in the statutes' text, history, or practice. Plaintiffs offer two examples as support, but neither helps them. First, Plaintiffs rely on President Reagan's suspension of Cuban immigrants in August 1986. *See* Proclamation No. 5517 (Aug. 26, 1986). But that Proclamation was issued in response to an event fifteen months earlier, in May 1985. *See id.*, pmbl. Thus, the Proclamation can hardly be described as a response to "a diplomatic event Congress . . . could not practicably address." *Id.* The same is true for the Haitian refugee crisis at issue in *Sale*. That situation first prompted Presidential action in 1981, and it continued through the Supreme Court's decision in June 1993 (with a particularly urgent crisis beginning 21 months earlier in September 1991). *See Sale*, 509 U.S. at 159-65. Again, that lengthy situation does not support Plaintiffs' narrow interpretation.[14]

### B. The Proclamation Does Not Conflict With the Overall INA Scheme

Plaintiffs argue that the Proclamation "contradicts multiple policy judgments Congress has enacted into law," and thus "exceed[s] the President's authority under § 1182(f)." IRAP Br. at 14.

#### 1. Congressional Amendments to the INA Do Not Limit the President's Pre-Existing Statutory Authority

**a.** Plaintiffs' argument assumes that, every time Congress alters a provision of the INA, it is impliedly repealing the President's authority under §§ 1182(f) and 1185(a)(1) to act on the same subject. That is contrary to well-settled principles of statutory construction. "[R]epeals by

---

[14] Other examples likewise undermine Plaintiffs' theory. For instance, President Carter's 1979 Executive Order responded to the Iranian hostage crisis, which lasted from November 1979 to January 1981. Congress legislated on that subject at least once during that time period, *see* Hostage Relief Act of 1980, Pub. L. No. 96-449, 94 Stat. 1967 (1980), but no court held that Congressional action eliminated the President's authority to impose restrictions on Iranian nationals. More recently, Presidents have continued to use § 1182(f) not solely to address exigencies, but rather as a tool to encourage foreign nations' cooperation with the United States' objectives. *See, e.g.*, Exec. Order No. 13,662 (Mar. 24, 2014); Proclamation No. 7524 (Feb. 26, 2002); Proclamation No. 6730 (Oct. 5, 1994).

implication are not favored," and "will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Branch v. Smith*, 538 U.S. 254, 273 (2003). Here, there is no conflict: Congress has set the *minimum* requirements for an alien to gain entry, but has also granted the President authority to impose *additional* restrictions when he deems appropriate. *See Knauff*, 338 U.S. at 541-42, 545-47 (holding that, although excluded alien would normally have been entitled to a statutory hearing on her exclusion, alien could be excluded without a hearing based on President's Proclamation under the predecessor to § 1185(a)(1) and implementing regulations).

Under Plaintiffs' theory, numerous Presidential exercises of §§ 1182(f) and 1185(a)(1) would be held unlawful. As Plaintiffs note, the INA contains a "long list" of grounds for inadmissibility, many of which implicate security, terrorism, or foreign policy. IRAP Br. at 19. Given the breadth and variety of those grounds, many exercises of the President's § 1182(f) authority could be characterized as supplanting a Congressional judgment embodied in one of those provisions. Plaintiffs' argument would severely circumscribe the President's authority, effectively reading §§ 1182(f) and 1185(a)(1) out of the INA entirely.

**b.** Plaintiffs' statutory theory is particularly ill-suited to the arena of national security and foreign affairs, which involve delicate balancing in the face of ever-changing circumstances, such that the Executive must be permitted to act quickly and flexibly. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (discussing the "changeable and explosive nature of contemporary international relations"); *see also Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 348 (2005). In this setting, courts typically apply the *opposite* presumption: courts will not assume Congress's intent to foreclose the President's authority over national security and foreign affairs unless Congress has specifically expressed that intent. *See, e.g., Jama*, 543 U.S. at 348 ("To infer an absolute rule . . .

where Congress has not clearly set it forth would run counter to our customary policy of deference to the President in matters of foreign affairs."); *Egan*, 484 U.S. at 530 ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.").

### 2.       The Proclamation Comports with the Provisions Plaintiffs Cite

The specific provisions of the INA relied upon by Plaintiffs do not demonstrate any conflict with the Proclamation.  Citing Congress's recent changes to the Visa Waiver Program, Plaintiffs assert that Congress already "considered the same problems" and enacted its solution.  IRAP Br. at 15.  But it is clearly permissible for the President and Acting Secretary to rely on factors similar to those considered by Congress; in doing so, they ensured that their actions are consistent with the INA's principles, as Plaintiffs suggest they should.  IRAP Br. at 13.

Moreover, Plaintiffs misinterpret the meaning of Congress's amendments to the Visa Waiver Program (VWP).  The amendments sought to address vulnerabilities associated with individuals eligible to travel under the VWP—for example, European nationals who have "gone to Syria, Iraq, and other countries of concern in order to train and fight alongside ISIS," and who can then use "their VWP country passports" to "board a plane bound for the U.S." and "reach U.S. shores with relative ease."  161 Cong. Rec. H9050-51 (Dec. 8, 2015) (Rep. Goodlatte).  Because none of the Proclamation's eight countries are VWP participants, however, the VWP amendments have no effect on the vast majority of those foreign nationals.  Thus, the VWP amendments can hardly be construed, as Plaintiffs suggest, to represent a Congressional judgment about the appropriate level of screening for every alien worldwide, including the approximately 160 countries that do *not* participate in the VWP—which is the broader set of risks the Executive sought to address through the worldwide review that preceded the Proclamation.  And as the legislative history confirms, Congress understood the VWP improvements to be only one piece of the puzzle,

and that additional measures may still be necessary to address risks in the immigration system.[15]

Plaintiffs also argue that "Congress has repeatedly tightened visa screening protocols in recent years." IRAP Br. at 19. It is true that, since September 11, 2001, Congress has enacted laws giving the Executive Branch better tools to detect terrorist entry. Like the Visa Waiver Program amendments, however, those statutes do not suggest that Congress concluded that the existing vetting system is sufficient and that the President may not act within his own authority to improve it or pressure other nations to provide the information needed to vet their nationals.

Plaintiffs next assert that the Proclamation "impermissibly alters the visa-processing standards Congress has chosen," by requiring an applicant to establish that denying entry would cause "undue hardship," and that their entry "would not pose a threat to the national security or public safety of the United States" and would "be in the national interest." IRAP Br. at 19-20 (quoting Procl. § 3(c)(i)(A)-(C)). But those "requirements" are part of the Proclamation's *waiver* provision that permit *exempting* certain foreign nationals from the Proclamation's restrictions. *See* Procl. § 3(c). Plaintiffs cannot use the waiver provision in § 3(c) to attack the validity of the entry restrictions in § 2. If the President has the greater authority to impose the entry suspensions in § 2 (and he does), that necessarily includes the lesser authority to provide for case-by-case exceptions. Indeed, waiver provisions are routinely included in Presidential entry restrictions. *See, e.g.*, Proclamation No. 8693, § 4; Proclamation No. 8342, § 2; Proclamation No. 6958, § 2.

---

[15] *See, e.g.*, 161 Cong. Rec. H9050 (Dec. 8, 2015) (Rep. Miller) ("I believe that the bill that we are considering today is the first of many, quite frankly, aimed at improving our security protocols."); *id.* at H9056 (Rep. Hoyer) ("The reforms in this bill are an excellent start."); *id.* at H9057 (Rep. Schiff) ("In the wake of the recent terror attacks, we must continue to review our existing security efforts to ensure we are doing all we can to protect the country."); *id.* at H9057 (Rep. King) ("We all know that it takes a lot of pieces of legislation to fill some of the holes that exist[.]"); *id.* at H9060 (Rep. Goodlatte) ("[T]his bill is just one of many, many things with regard to our immigration system that need to be examined."); *see also* 8 U.S.C. § 1187(c)(5)(A)(i)(V).

Finally, Plaintiffs assert that accepting the Government's interpretation of §§ 1182(f) and 1185(a)(1) would mean there is "no limit to what parts of the INA the President can cancel or revise"—for example, "ban[ning] all entry on employment-based visas" based on a finding that immigrant workers are detrimental.  IRAP Br. at 12.  Whatever outer limits may exist on the President's authority under §§ 1182(f) and 1185(a), however, they are not implicated by the Proclamation here, which addresses core concerns of national security, foreign relations, and public safety.  The Proclamation does not seek to subvert the INA by reinstituting a quota system, or by suspending an entire class of visas such as employment-based visas.  To the contrary, the Proclamation seeks to *further* the INA by ensuring that the Government has the information needed to determine whether aliens present national-security or safety risks.

### C.     The Proclamation Does Not Run Afoul of Section 1152(a)(1)

Plaintiffs argue that the Proclamation violates the non-discrimination provision of § 1152(a)(1)(A).  IRAP Br. at 20-22.  Plaintiffs' argument is wrong for several reasons, including because it would lead to the absurd result that the President could not invoke his authority to restrict entry of nationals from a country with which the United States is at the brink of war.

### 1.     Success On This Claim Would Not Support the Requested Injunction

As an initial matter, Plaintiffs do not dispute that, under the immigration laws, "entry" is a distinct act from obtaining a visa.  Both this Court and the Fourth Circuit have previously recognized this distinction.  *See IRAP*, 241 F. Supp. 3d at 554; *IRAP*, 857 F.3d at 580-81; *see also id.* at 608 (Keenan, J., concurring).  And this distinction is important because 8 U.S.C. §§ 1182(f) and 1185(a)(1) allow the President to restrict *entry*, whereas § 1152(a)(1)(A) prohibits nationality-based discrimination in the issuance of *visas*.

Accordingly, even if Plaintiffs were correct that the Government was violating § 1152(a)(1)(A) by denying immigrant visas on the basis of nationality, the remedy would be to

enjoin the Government from refusing to issue visas on the basis of the Proclamation.  But in no event would the remedy extend to an injunction compelling the Government to grant individuals *entry* into the United States.  Plaintiffs' success on this claim—whatever its effect on issuance of visas—would therefore not support invalidating the Proclamation's *entry* suspensions.

### 2. There Is No Conflict Between the Non-Discrimination Provision and the President's Suspension Authorities

In any event, the non-discrimination provision does not conflict with the President's suspension authorities because the statutes operate in two different spheres.  "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (citation omitted).  Here, there is an easy way to harmonize the statutes:  §§ 1182(f) and 1185(a)(1) limit the universe of individuals eligible to receive visas, and § 1152(a)(1)(A) prohibits discrimination on the basis of nationality within that universe of eligible individuals.

The legislative history shows that Congress also understood the INA to operate in this manner.  The 1965 amendments (of which § 1152(a)(1)(A) was a part) were designed to eliminate the country-quota system previously in effect, *not* to limit any of the pre-existing provisions like §§ 1182(f) or 1185(a)(1) addressing entry or protecting security.  *See* H. Rep. No. 745, 89th Cong., 1st Sess., at 13 (1965) ("It should be emphasized that there has been no relaxing of the qualitative criteria for admissibility to the United States and that no relaxation of the mental, health, moral, economic, and security criteria is proposed.  The bill is not a comprehensive overhaul of the immigration laws."); S. Rep. No. 748, 89th Cong., 1st Sess., at 11 (1965) (similar).  The history expressly states that the new immigrant-selection system (now codified in § 1152) was intended to operate only as to those *otherwise eligible for visas*.  *See* H. Rep. No. 745, 89th Cong., 1st Sess., at 12 (1965) (Under this [new] system, selection *from among those eligible to be immigrants . . .*

will be based upon the existence of a close family relationship to U.S. citizens or permanent resident aliens and not on the existing basis of birthplace or ancestry." (emphasis added)); S. Rep. No. 748, 89th Cong., 1st Sess., at 13 (1965) (similar).   There is thus no conflict between the statutes:   §§ 1182(f) and 1185(a)(1) limit the universe of potentially eligible immigrants, and § 1152(a)(1) prohibits discrimination within that universe of eligible immigrants.

Historical practice also confirms this interpretation.   First, with respect to § 1185(a), in 1979 President Carter directed the Secretary of State and the Attorney General to adopt "limitations and exceptions" regarding "entry" of "Iranians holding nonimmigrant visas."   Exec. Order No. 12,172 (Nov. 26, 1979); *see also Immigration Laws and Iranian Students*, 4A Op. O.L.C. 133, 140 (1979).   President Carter subsequently amended that directive to make it applicable to all Iranians. *See* Exec. Order No. 12,206 (Apr. 7, 1980).   Although President Carter's Order itself did not deny or revoke visas to Iranian nationals by its terms, that is how the State Department implemented it. *See* 45 Fed. Reg. 24,436 (Apr. 9, 1980).   Similarly, President Reagan invoked § 1182(f) to suspend immigrant entry of "all Cuban nationals," subject to exceptions.   Proclamation No. 5517.   And the Supreme Court in *Sale* deemed it "perfectly clear" that § 1182(f) would authorize a "naval blockade" against illegal migrants from a particular country.   509 U.S. at 187.

### 3.   In the Event of a Conflict, the President's Suspension Authorities Would Prevail

Interpreting § 1152(a)(1)(A) as limiting §§ 1182(f) or 1185 would require concluding that § 1152(a)(1)(A) impliedly repealed those provisions, because nationality-based restrictions would otherwise naturally fall within their plain terms.   But implied repeals are disfavored, and in the event of a conflict between the statutes, the suspension authorities would prevail.

Plaintiffs assert that § 1152(a)(1)(A) is later-enacted and thus should prevail.   IRAP Br. at 22.   While § 1152(a)(1)(A) was later-enacted with respect to § 1182(f), that is not true for

§ 1185(a)(1), which was modified to its current form in 1978.  *See* Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95-426, § 707(a), 92 Stat. 992-993 (1978).  Even under Plaintiffs' approach, then, § 1185(a)(1) would prevail over § 1152(a)(1)(A).  Plaintiffs also assert that § 1152(a)(1)(A) is "more specific" on the issue of nationality-based discrimination.  But there is no indication that Congress intended a default rule governing non-discrimination in the visa-issuance context to supersede the *President's* authority to suspend entry.  Section 1182(f) confers special power on the President to suspend entry of aliens, and that unique grant of authority to the President himself is more specific and should supersede § 1152(a)(1)(A)'s general rule governing visa issuance.[16]

\*       \*       \*       \*

If this Court accepted Plaintiffs' request to interpret §§ 1182(f) and 1152(a)(1)(A) as constraints on the President's constitutional powers—by requiring the President, before suspending the entry of any alien, to articulate a detailed factual basis akin to APA-style judicial review, and by prohibiting the President from ever suspending the entry of nationals from a particular country, even in response to an urgent crisis (*e.g.*, the brink of war with that country)— then the statutes would raise grave constitutional questions.  This Court should reject Plaintiffs' interpretations for that reason alone.

---

[16] Even if Plaintiffs were correct that § 1152(a)(1)(A) prevails and would otherwise forbid withholding visas from aliens whose entry was suspended, § 1152(a)(1)(B) confirms that the State Department's procedure of implementing § 1182(f) suspensions by denying visas to excluded individuals does not violate § 1152(a)(1)(A).  Section 1152(a)(1)(B) makes clear that § 1152(a)(1)(A) does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications."  *See* H.R. Conf. Rep. No. 828, 104th Cong., 2d Sess., at 248 (1996) ("This section amends [§ 1152(a)(1)] to clarify that the Secretary of State has non-reviewable authority to establish procedures for the processing of immigrant visa applications and the locations where visas will be processed." (emphasis added)).

### III.    The Proclamation Does Not Violate the Establishment Clause

Under Supreme Court precedent, the President's national-security and foreign-policy determinations set forth in the Proclamation provide "a facially legitimate and bona fide reason" for the Proclamation's exclusion of aliens. *Mandel*, 408 U.S. at 770. That ends the Establishment Clause inquiry. But even if the Court were to disregard *Mandel*'s deferential standard and look instead to inapposite domestic Establishment Clause cases, the Proclamation is still valid. The Proclamation's entry restrictions are the result of worldwide review and diplomatic engagement processes designed to protect national security and improve nations' information-sharing practices. Plaintiffs' evidence relates almost entirely to campaign statements about a suggested policy that was never adopted in any form, and they have not shown that the Proclamation was issued for a religious purpose. Instead, Plaintiffs have simply shown that, no matter the deliberativeness and thoroughness of the government's process, they will continue to allege that the President's actions to protect national security are all motivated by animus.

### A.    The Proclamation Is Constitutional Under *Mandel*

**1.** The Fourth Circuit's now-vacated ruling acknowledged that *Mandel*'s test applies to constitutional challenges to the exclusion of aliens abroad. *See IRAP*, 857 F.3d at 588. Under that test, when the Executive gives "a facially legitimate and bona fide reason" for excluding an alien, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens. *Mandel*, 408 U.S. at 770. This rule reflects that Constitution "exclusively" allocates power over the admission of aliens to the "political branches," *id.* at 765 (citation omitted), and that aliens abroad have no constitutional rights at all regarding entry into the country. *See Fiallo*, 430 U.S. at 792-96 (applying *Mandel*'s test to equal-protection challenge to statute).

*Mandel* compels rejecting Plaintiffs' Establishment Clause claim. The Proclamation's

entry restrictions rest on facially legitimate reasons:  protecting national security and enhancing the government's leverage in persuading foreign governments to share information needed to screen their nationals.  *See* Procl. § 1.  The Proclamation also sets forth a bona fide basis for these reasons:  after the worldwide review and diplomatic engagement required by EO-2, the nations to which entry restrictions apply continued to have inadequate information-sharing practices or otherwise presented heightened risk factors.  The Proclamation describes the global review process undertaken by DHS, in consultation with other agencies; the neutral criteria against which all nations were assessed; the subsequent diplomatic engagement process during which the Department of State encouraged nations to improve their performance; and the resulting recommendations of the Acting Secretary of DHS.  *See id*. § 1(a)-(f), 1(i).  It further explains that, based on the Acting Secretary's recommendations and after consulting with members of the Cabinet, the President "craft[ed] . . . country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur."  *See id*. § 1(h).  These facially legitimate and bona fide reasons for the Proclamation's entry restrictions readily satisfy *Mandel*'s test.  Thus, Plaintiffs' Establishment Clause claim fails.

In reviewing the constitutionality of EO-2, the Fourth Circuit erroneously determined that *Mandel*'s "bona fide" requirement permits courts to examine whether the Government's stated reasons were given "in good faith."  *IRAP*, 857 F.3d at 590-91.  The court's error is made clear by a subsequent decision of the Supreme Court.  In *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017), the Supreme Court described *Mandel*'s standard as "minimal scrutiny (rational-basis review)."  Rational-basis review is objective and does not permit probing government officials' subjective intentions or second-guessing the Executive's national-security and foreign-policy

determinations. *See Western & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 671-72 (1981) (rational-basis standard does not ask "whether in fact [a] provision will accomplish its objectives," but whether the government "rationally could have believed" that it would do so); *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (if "there are plausible reasons for" the challenged action, the rational-basis "inquiry is at an end"). The Fourth Circuit's now-vacated understanding of *Mandel* cannot be squared with *Morales-Santana*.

Indeed, *Mandel*'s objective rational-basis standard has particular force here, as courts are generally "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's "reasons for deeming nationals of a particular country a special threat." *AAADC*, 525 U.S. at 491. And courts similarly must be "wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs" because of the impact it could have on the United States' foreign relations. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 695 (2004).[17]

Because the face of the Proclamation provides an ample basis for its restrictions, the Court's inquiry is at an end. The Court cannot look behind the stated reasons in an effort to determine for itself whether the President's national-security and foreign-policy justifications were given in good faith.

    **2.** In any event, Plaintiffs do not and cannot show that the Proclamation's stated national-

---

[17] The Fourth Circuit based its approach on a reference to "bad faith" in the concurrence in *Din*. *IRAP*, 857 F.3d at 590-91. But the concurrence did not propose an enormous loophole in *Mandel*, especially with respect to a formal national-security and foreign-policy determination of the President. It merely hypothesized that, if the government had not identified a factual basis for the consular officers' decision at issue, the plaintiff might have been able to seek "additional factual details" about the basis of the consular officer's decision (provided the information is not classified). *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in judgment). In contrast, when the government does identify a factual basis—as it did in *Mandel* and *Din* by citing a statutory provision that itself included sufficient factual predicates, and also has done here through the Proclamation's text—that is the end of the analysis.

security and foreign-policy rationales are a pretext for a purported motive of banning Muslims. *See* IRAP Br. at 24-25.  Plaintiffs rely solely on the Fourth Circuit's prior conclusion in its vacated decision, which is not controlling law, that EO-2 was issued in bad faith.  *See id*. at 25.  But the allegations against EO-2 cannot justify a similar determination against a different government action—the Proclamation.  Indeed, as the *IRAP* plaintiffs previously acknowledged, future presidential actions should be judged on their own terms.  *See, e.g.*, Tr. of Hearing for TRO at 10, *IRAP v. Trump* (D. Md. Mar. 15, 2017) (arguing that invalidation of EO-2 would not "tie[] the hands of the Government going forward" because in future challenges the court would "take into account what's changed, what's different, both in the order itself or the law itself and in the conditions on the ground"); IRAP Reply Br. (ECF No. 130) at 11-12 n.15.

Nearly all of the evidence on which the Fourth Circuit relied predates the Proclamation by more than a year.  And the Proclamation is the result of worldwide review and diplomatic engagement processes that took place after EO-2's issuance.  These processes combined the efforts of multiple government agencies and resulted in recommendations from the Acting Secretary of DHS to the President as to what entry restrictions were necessary to address the inadequacies identified by the agencies during their review and to encourage countries to cooperate with the United States to address those inadequacies.  The processes and the resulting entry restrictions are more tailored and relate to a different set of countries than those in EO-2.

Plaintiffs cannot plausibly maintain that the numerous government officials involved in the global review and engagement processes were acting in bad faith or harbored anti-Muslim animus, and Plaintiffs have made no such allegations.  Plaintiffs' theory also would require the Court to conclude that the Government's diplomatic efforts—which resulted in numerous countries providing travel document exemplars and agreeing to share information on suspected terrorists—

were a charade.  Plaintiffs again provide no basis for such an assertion.

**B.      The Proclamation is Valid Under Domestic Establishment Clause Precedent**

Even in the domestic context, a court deciding whether official action violates the Establishment Clause because of an improper religious purpose looks only to "the 'text, legislative history, and implementation of the statute,' or comparable official act." *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 862 (2005).  The court is not to engage in "judicial psychoanalysis of a drafter's heart of hearts." *Id.*  Searching for purpose outside the operative terms of governmental action makes no sense in the Establishment Clause context, because it is only an "official objective" of favoring or disfavoring religion that implicates the Clause. *Id.*

There is no basis for invalidating the Proclamation under that standard.  The Proclamation's text does not refer to or draw any distinction based on religion.  And the Proclamation's "operation," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993), confirms that it is religion-neutral:  it applies tailored restrictions to eight countries based on detailed findings regarding the national-security and foreign-policy interests of the United States that were reached after a thorough, worldwide review and extensive consultation, and the entry restrictions apply to certain nationals of those countries without regard to their religion.

Plaintiffs assert that an anti-Muslim purpose can be inferred from the Proclamation's inclusion of six majority Muslim countries.  But the Proclamation omits the overwhelming number of majority-Muslim countries, including Sudan and Iraq, both of which were included in prior entry suspensions under EO-2 or Executive Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017) [hereafter "EO-1"].  It is neither surprising nor pernicious that the six majority Muslim countries are included, as five of them were previously identified by Congress and DHS as countries presenting terrorism-related concerns. *See* 8 U.S.C. § 1187(a)(12).  In addition, the Proclamation applies entry restrictions to two countries that do not have majority Muslim populations (North

Korea and Venezuela), and a third country that has a substantial (approximately 48 percent) non-Muslim population (Chad). *See* CIA, The World Factbook: Africa: Chad, https://www.cia.gov/library/publications/the-world-factbook/geos/cd.html.

Plaintiffs' assertion also ignores that the entry restrictions in the Proclamation are customized for each nation, with the aim of balancing the Government's national-security and foreign-policy goals. *See* Procl. § 1(h). Thus, nationals of some designated countries can enter the United States for certain purposes.[18] The Proclamation also provides for case-by-case waivers of the entry restrictions in a variety of circumstances. *See id.* § 3(c). And it requires periodic reviews so that entry restrictions can be removed or relaxed if countries improve their information-sharing practices. *See id.* § 4. Neither the Proclamation's text nor its operation evidence an intent to exclude Muslims.

Plaintiffs rely almost exclusively on the Fourth Circuit's now-vacated conclusion that EO-2 was motivated primarily by religion to argue that the Proclamation was similarly motivated. *See* IRAP Br. at 26-29. Thus, Plaintiffs' purported evidence of improper purpose is largely a rehashing of campaign-trail statements and informal remarks of the President's aides about EO-1 and EO-2. *See id.* Even if those statements could be considered in the search for *official* purpose at all (and they cannot, as the Government previously argued), they do not demonstrate that the Proclamation's purpose is religious.

"[P]ast actions" cannot "forever taint" future government efforts. *McCreary*, 545 U.S. at

---

[18] For example, the entry suspensions do not apply to Iranian nationals seeking to enter on student (F and M) and exchange visitor (J) visas, which, in FY 2016, totaled 4,368 individuals. *See* U.S. Department of State, Nonimmigrant Visas Issued, FY 2016, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16 AnnualReport-TableXVII.pdf. Similarly, Yemeni nationals may enter on most types of non-immigrant visas; in FY 2016, 1,271 individuals entered the United States on such visas. *See id.*

874.  Nearly all of the statements on which Plaintiffs rely were made more than a year before the President issued the Proclamation.  *See* IRAP Br. at 26, 29.  In addition, none of the statements address the Proclamation; rather, they are about campaign-trail suggestions that were never adopted, EO-1, or EO-2.  Past statements that are not connected to the Proclamation are not relevant to the Government's purpose.

Finally, the specific sequence of events leading to the issuance of the Proclamation severs any connection between EO-2's supposed religious purpose and the Proclamation.  *Cf. Felix v. City of Bloomfield*, 841 F.3d 848, 863 (10th Cir. 2016) (explaining that "curative efforts" can "neutralize" a previously religious message); *Books v. City of Elkhart, Ind.*, 235 F.3d 292, 304 (7th Cir. 2000) (acknowledging that "subsequent history" can "transform[] [a] religious purpose").  The global review and diplomatic engagement processes that led to the Proclamation—which entailed participation of numerous Executive Branch agencies, employed religion-neutral criteria to assess the risks posed by all nations, and provided for a period of diplomatic engagement in an effort to reduce or eliminate the need for any entry restrictions—demonstrate that the Proclamation has a distinct foundation.  *See, e.g.*, *McGowan*, 366 U.S. at 445 (stating that original religious purpose of Sunday closing laws did not preclude legislature from achieving secular goals by prescribing Sunday as a day of rest); *Children's Healthcare is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1088-89, 1099 (8th Cir. 2000) (upholding statutory amendment that provided religious exemption even though prior version was invalidated on Establishment Clause grounds).[19]

---

[19] Plaintiffs assert that EO-2's purported religious purpose infects the Proclamation because the global review and engagement processes were required by certain sections of EO-2.  *See* IRAP Br. at 29.  This Court, however, did not enjoin those sections of EO-2 precisely because it did not find that they were motivated by a religious purpose.  *See IRAP*, 241 F. Supp. 3d at 565; *see also IRAP*, 137 S. Ct. at 2089 (explaining that Court's partial stay of EO-2 injunctions would "permit the Executive to conclude its internal work and provide adequate notice to foreign governments").  Moreover, EO-2 did not dictate the results of the comprehensive review it required.

Citing *McCreary*, Plaintiffs contend that the differences between EO-2 and the Proclamation amount to "little more than the kind of 'litigating position' that reasonable observers easily see through."  IRAP Br. at 27.  That allegation disregards that the Proclamation was based on recommendations of the Acting Secretary of DHS after an extensive, multi-agency process.  *See United States v. Chemical Found., Inc.*, 272 U.S. 1, 14 (1926) (describing the "presumption of regularity" that attaches to all federal officials' actions).  In any event, comparing the Proclamation to the third in a series of Ten Commandments displays at issue in *McCreary* demonstrates that the Proclamation does not embody a religious purpose.

First, *McCreary* involved displays with explicitly religious content, and the issue was whether the displays had a secular purpose that rendered them permissible under the Establishment Clause.  Here, the Proclamation has no reference to religion in its terms or its operation.

Second, although the counties in *McCreary* offered new statements of a secular purpose for the third display in litigation, those statements were not supported by any "authorizing action by the Counties' governing boards."  545 U.S. 871.  The display also contained "no context that might have indicated an object beyond the religious character of the text."  *Id*. at 868.  In contrast, the Proclamation does not mention religion, and explains its secular purposes—to protect national security and enhance the Government's leverage in persuading nations to supply information needed to screen their nationals.  The context in which the Proclamation was issued—after multi-agency review and consultation—highlights its national-security and foreign-policy objectives.

Third, unlike the third display in *McCreary*, which "quoted more of the purely religious language of the Commandments than the first two displays had done," 545 U.S. at 872, the Proclamation materially differs from EO-2 in ways that eliminate—rather than add to—any supposed religious message.  The Proclamation is supported by new and different national-security

findings, reached after thorough, worldwide review and engagement processes, and based on recommendations of the Acting Secretary of DHS.  It applies to a different set of countries than EO-1 or EO-2: majority Muslim countries like Sudan and Iraq have been removed, while non-majority Muslim countries like North Korea and Venezuela have been added.  And the Proclamation imposes more tailored entry restrictions than EO-1 or EO-2, which allow nationals from some designated countries to enter for certain purposes.

Lastly, the counties in *McCreary* never "repudiated" the resolutions authorizing the prior Ten Commandments displays, which contained "extraordinary" references to religion.  545 U.S. at 871.  Here, in contrast, since EO-2's issuance, the President has, in an official address, praised Islam as "one of the world's great faiths," decried "the murder of innocent Muslims," and emphasized that the fight against terrorism "is not a battle between different faiths, different sects, or different civilizations," but one "between barbaric criminals who seek to obliterate human life and decent people" of all religions who "want to protect life."  Washington Post Staff, President Trump's full speech from Saudi Arabia on global terrorism, Wash. Post, May 21, 2017, https://goo.gl/viJRg2.  Thus, the Proclamation represents a "genuine change[] in constitutionally significant conditions."  *McCreary*, 545 U.S. at 874.

In sum, by arguing that the campaign and other statements that preceded EO-2 continue to taint the Proclamation notwithstanding all of the procedural and substantive differences between the two, Plaintiffs effectively contend that President Trump is forever disabled from regulating immigration from majority-Muslim countries.  No case supports that dangerous approach, *McCreary* and others refute it, and this Court should reject it too.[20]

---

[20] Plaintiffs argue in a single paragraph that the Proclamation discriminates based on religion in violation of the Equal Protection Clause.  *See* IRAP Br. at 30-31.  That claim fails for the same reasons as Plaintiffs' Establishment Clause claim.  *See, e.g.*, *Fiallo*, 430 U.S. at 792-96.

**IV.    The Remaining Preliminary Injunction Factors Weigh Against Relief**

Plaintiffs have not demonstrated that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.  The closest Plaintiffs come to alleging concrete harm is their assertion that the Proclamation will prevent their foreign-national family members from entering the United States while the Court considers the case on the merits.  But delay in entry alone does not amount to irreparable harm.  Visa processing times vary widely, and until the aliens abroad meet the otherwise-applicable visa requirements and seek and are denied a waiver, they have not received final agency action and their claimed harms are too "remote" and "speculative" to merit injunctive relief.  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

On the other side of the scales, an injunction would cause direct, irreparable injury to the government and public interest.  "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  *A fortiori*, the same principle applies to a national-security and foreign-policy judgment of the President.  "[N]o governmental interest is more compelling than the security of the Nation," *Agee*, 453 U.S. at 307, and "the President has unique responsibility" in this area, *Sale*, 509 U.S. at 188.  Courts, moreover, have recognized the danger of "impinging on the discretion of the [President] in managing foreign affairs." *Sosa*, 542 U.S. at 695.  The Department has formally recommended entry restrictions to address ongoing "threats . . . to the security and welfare of the United States," and the President likewise exercised his judgment to craft country-specific entry restrictions that will "be most likely to encourage cooperation" while at the same time "protect[ing] the United States."  Procl. § 1(h). The Court should not interfere with, or second-guess, those judgments.

## V.      A Global Injunction Would Be Inappropriate

Constitutional and equitable principles require that any injunctive relief be limited to redressing a plaintiff's own cognizable injuries.   Article III requires that "a plaintiff must demonstrate standing . . . for each form of relief that is sought."   *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).   "The remedy" sought therefore must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established."   *Lewis v. Casey*, 518 U.S. 343, 357 (1996).   Equitable principles independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."   *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

In light of these principles, any injunction the Court enters should be limited to relieving the specific injury of only those Plaintiffs whom the Court determines have a cognizable and meritorious claim and who will suffer irreparable harm in the absence of an injunction.   The injunction should not extend beyond those Plaintiffs' identified family members, clients, or members.   The injunction also should not extend beyond Section 2 of the Proclamation; nor should it cover the specific provisions of Section 2 that Plaintiffs do not challenge, like the entry restrictions for Chad, Libya, North Korea, and Venezuela.   *See IRAP*, 241 F. Supp. 3d at 565.

The Proclamation's severability clause compels the same approach.   Section 8(a) provides that, if "the application of any provision to any person or circumstance[] is held to be invalid," then "the application of [the Proclamation's] other provisions to any other persons or circumstances shall not be affected."   Such tailored relief would pose far less interference than enjoining the President's directive wholesale based on alleged injuries to a few plaintiffs.

### CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: October 12, 2017                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General

                                           HASHIM M. MOOPPAN
                                           Deputy Assistant Attorney General

                                           STEPHEN M. SCHENNING
                                           Acting United States Attorney

                                           JENNIFER D. RICKETTS
                                           Director, Federal Programs Branch

                                           JOHN R. TYLER
                                           Assistant Director, Federal Programs Branch

                                           */s/  Daniel Schwei*
                                           DANIEL SCHWEI (Bar No. 96100)
                                           MICHELLE R. BENNETT (Bar No. 806456)
                                           ARJUN GARG (Bar No. 806537)
                                           Senior Trial Counsel / Trial Attorney
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave. NW
                                           Washington DC 20530
                                           Tel: (202) 305-8693
                                           Fax: (202) 616-8470
                                           E-mail: daniel.s.schwei@usdoj.gov